[No. 72635-3.   En Banc.]

Argued February 25, 2003.     Decided July 24, 2003.

SUNNYSIDE VALLEY IRRIGATION DISTRICT, *Respondent*, v. DYKE DICKIE, ET AL., *Petitioners.*

874

*John S. Moore, Jr.* (of *Velikanje, Moore & Shore, P.S.*), for petitioners.

*Charles C. Flower* and *Patrick M. Andreotti* (of *Flower & Andreotti*), for respondent.

FAIRHURST, J. — Sunnyside Valley Irrigation District (SVID) maintains irrigation ditches, commonly referred to as laterals, in the Yakima County region. In general, adjacent landowners have granted express floating or roving easements to SVID to enter land adjacent to the laterals and remove any sediment and growth collected over time that obstructs the flow of water. This case involves easements for the Matheson 2.68 lateral (lateral). The issue is whether the parties intended widening of the easement to accommodate increased irrigation demands and the use of more efficient maintenance equipment. SVID contends the express terms of the easement permit widening and the original recording parties contemplated this widening. The current owners of the easement-encumbered property, Dyke and Jane Doe Dickie (Dickie), dispute SVID's claim. We agree with SVID and affirm the Court of Appeals.

## FACTS

Dickie owns two full tracts (Nos. 129 and 130) and part of a third tract (No. 131) of agricultural land in Yakima County across which the lateral flows. The lateral was originally constructed sometime between 1905 and 1923, and serves a total of 1,353 acres, 65 acres of which are located downstream from Dickie's property. The lateral is part of the Sunnyside Canal Division of the Yakima Reclamation Project.

Dickie's properties are subject to easements filed in 1908, 1912 and 1925, granting the holder the right to access land adjacent to the lateral to conduct maintenance. The 1925 easement grants the following:

Sixth: That the Purchaser . . . agrees to grant . . . *the necessary right-of-way for the . . . maintenance of all . . . laterals . . . of* the United States of America, or said Irrigation Company . . . with the *right and permission to enter upon said land for the . . . enlargement and repair of said . . . laterals, . . .* and to *. . . maintain and repair the same* by the United States of America, or the Irrigation Company, or the owner or owners of lower lands.

Pl.'s Ex. 43 (emphasis added). Very similar language also appears in the 1908 and 1912 grants.

Initially, the United States maintained the lateral. In 1945, SVID assumed responsibility. SVID then delegated the responsibility to "maintenance districts" comprised of local landowners. In the late 1970s to early 1980s, SVID reassumed the maintenance responsibilities for several reasons including better quality of service, lack of interest from the individual landowners to continue performing the work, and increased costs and liability associated with maintenance.

Maintenance of the lateral is important because it removes sediment and ensures the flow of water at its capacity. At least early on, maintenance was accomplished by human labor, horses and slips (horse drawn scrapers). Over time, the use of power equipment replaced manual labor. Power equipment requires more operational space than the earlier methods.

SVID has used several types of power equipment to maintain the lateral. Initially, SVID maintained the lateral with a backhoe. The backhoe, while faster than manual labor, was still time consuming because the backhoe operator had to stop constantly to reposition the backhoe as it moved along the lateral.

In about 1988, SVID replaced the backhoe with a more efficient sloper machine (sloper). The sloper has a blade that extends down into the lateral and pulls sediment to the top of the lateral's bank. As the sediment is pulled to the top of the bank, another blade flattens the sediment out. The sediment is flattened, rather than kept in piles, to prevent

the blocking of airflow through the farmlands. The track width (width at the base) of the sloper is approximately 8-1/2 feet, not including the length of the extendable blade. The fully extended blade on the sloper is approximately 16 to 20 feet in length. The sloper is roughly five times as efficient as the backhoe. Unlike the backhoe, it does not require constant repositioning and it can clean several miles of the lateral in a day. In addition, the sloper is much better than the backhoe at maintaining constant slopes on the lateral walls. This is important to effectively collect sediment and maintain an even flow of water.

In conjunction with the backhoe and/or sloper, SVID has used mowers to cut down weeds and to repair leaks along the banks of the lateral during the irrigation season. The track width on the mower is approximately 8 feet, not including the length of the mower arm extension. The mower arm extension can extend down into the lateral along its sloped walls.[1]

SVID requires about 20 feet from the lateral's center line to conduct its maintenance operations using power equipment. This 20 foot distance includes a 2 to 3 foot setback from the lateral's edge that is required to prevent the weight of the power equipment from collapsing the walls of the lateral and imperiling the power equipment operator.

The Roza Division is part of the Yakima Reclamation Project and irrigates agricultural property upstream from Dickie's land and drains into the lateral. Geological survey documents show that, as early as 1905, the United States planned development of the Roza Division. It was eventually constructed in the mid 1940s to the early 1950s. By design, a significant portion of the return flow from the Roza Division ends up in the lateral. The additional flow results in substantially more aquatic grass, weed growth and sediment in and around the lateral. Consequently, SVID has enlarged and flattened the slope on the lateral to accommodate the increased flow and to facilitate the increased maintenance.

---

[1] The record does not indicate the length of the mower arm extension.

On March 9, 2000, SVID initiated this lawsuit alleging that trees and sprinklers on Dickie's land interfered with its maintenance of the lateral. On the north side of the lateral, Dickie has old established cherry trees, newly planted cherry trees and sprinklers within 20 feet of the lateral's center line. Dickie planted the new cherry trees and installed the new sprinklers in 1998. Before that time, SVID could work more easily around obstructions on the land.

SVID contends that it requires 20 feet from the lateral's center line for maintenance, and the easements on Dickie's tracts allow for this expansion. Dickie argues that the easements do not allow expansion of the original widths used in the early 1900s when maintenance was conducted by manual labor.

The trial court ruled in favor of SVID and ordered Dickie to remove any trees and other property within 20 feet north of the lateral's center line. The Court of Appeals affirmed. *Sunnyside Valley Irrig. Dist. v. Dickie*, 111 Wn. App. 209, 43 P.3d 1277 (2002). We granted Dickie's petition for review. *Sunnyside Valley Irrig. Dist. v. Dickie*, 147 Wn.2d 1020 (2002).

## ISSUE

Whether the easements on Dickie's tracts grant SVID the right to enlarge its right-of-way over time based upon future demands for irrigation and maintenance?

## ANALYSIS

Findings of fact are reviewed under a substantial evidence standard, defined as a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). If the standard is satisfied, a reviewing court will not substitute its judgment for that of the trial court even though it might have resolved

a factual dispute differently. *Croton Chem. Corp. v. Birkenwald, Inc.*, 50 Wn.2d 684, 314 P.2d 622 (1957). Questions of law and conclusions of law are reviewed de novo. *See Veach v. Culp*, 92 Wn.2d 570, 573, 599 P.2d 526 (1979). The interpretation of an easement is a mixed question of law and fact. *Id.* What the original parties intended is a question of fact and the legal consequence of that intent is a question of law. *Id.*

■ The intent of the original parties to an easement is determined from the deed as a whole. *Zobrist v. Culp*, 95 Wn.2d 556, 560, 627 P.2d 1308 (1981). If the plain language is unambiguous, extrinsic evidence will not be considered. *City of Seattle v. Nazarenus*, 60 Wn.2d 657, 665, 374 P.2d 1014 (1962). If ambiguity exists, extrinsic evidence is allowed to show the intentions of the original parties, the circumstances of the property when the easement was conveyed, and the practical interpretation given the parties' prior conduct or admissions. *Id.*

■ An easement defined in general terms, without a definite location or description, is called a floating or roving easement (floating easement). *See Berg v. Ting*, 125 Wn.2d 544, 552, 886 P.2d 564 (1995). Generally, a floating easement becomes fixed after construction and cannot thereafter be changed. *Rhoades v. Barnes*, 54.Wash. 145, 149, 102 P. 884 (1909). If the floating easement has an undefined width, it is bounded by the doctrine of reasonable enjoyment. *Everett Water Co. v. Powers*, 37 Wash. 143, 152, 79 P. 617 (1905). Under the doctrine of reasonable enjoyment, the width is restricted to that which is reasonably necessary and convenient to effectuate the original purpose for granting the easement. *Id.*

The issue of whether the scope of an easement can change over time to accommodate anticipated, but not yet realized, future demands is a subject of first impression in Washington. Dickie argues that the width of the easement became fixed when the lateral was first constructed between 1905 and 1923, when the maintenance area was considerably smaller and the maintenance work was primarily done with

manual labor. Dickie contends that allowing widening does not comport with *Rhoades*, which held that the size and location of a floating easement becomes fixed upon its original construction. *Rhoades*, 54 Wash. at 149.

In *Rhoades*, a water company obtained a floating easement for a 4 1/2 inch pipe across the grantor's land. *Id*. at 146. Needing additional water, the water company received "permission," but not an easement, to move to another location and lay an 8 inch pipe. *Id*. The water company then granted a third party permission to use water from this 8 inch pipe. *Id*. The successor property owner objected to the third party's use. *Id*. at 147. The third party contended their property rights emanated from the original grant for the 4 1/2 inch pipe. *Id*. Finding against the third party, the *Rhoades* court held that the grant for the 4 1/2 inch pipe in one location did not automatically create an identical right in the 8 inch pipe at the other location. *Id*. at 147-49. It also held that the size and location of a floating easement is established and fixed after its original construction, and the grantee is not thereafter permitted to change the scope at will. *Id*. at 149; *see also McCue v. Bellingham Bay Water Co.*, 5 Wash. 156, 159, 31 P. 461 (1892) (holding that the grantee cannot relocate a floating easement after already selecting and constructing a water pipeline pursuant to the original grant even if the grantee considered the original location only temporary); *Everett Water Co.*, 37 Wash. at 151 (holding that the location of a floating easement became fixed when the grantee selected a location and dug a ditch on the grantor's land); *Smith v. King*, 27 Wn. App. 869, 620 P.2d 542 (1980) (holding that a person cannot relocate a floating easement if his or her predecessor already constructively located it pursuant to a quitclaim deed). *Rhoades* and its progeny are not relevant here because they do not concern easements that contain language contemplating future enlargement.

Dickie also contends that *Mielke v. Yellowstone Pipeline Co.*, 73 Wn. App. 621, 624, 870 P.2d 1005 (1994), supports their position that a floating easement can never change

over time. In *Mielke*, the grantee needed to replace the pipeline, that was permitted by the floating easement. *Id.* at 623. The threshold issue concerned the "replacement" language in the deed. *Id.* at 624. The grantee claimed the industry custom was to lay replacement pipeline parallel to the existing line while the original line remained in operation. *Id.* at 623. To construct the new pipeline safely, the grantee said it needed to maintain a safe distance from the old pipeline. *Id.* After construction of the new pipeline, the old pipeline would be removed. *Id.* The grantee claimed that the only practicable location for the new pipeline was 10 feet or more west of the old pipeline. *Id.* Although conceding that the location of the right-of-way became fixed when the original pipeline was installed, the grantee asserted that the width of its easement under the doctrine of reasonable enjoyment permitted its proposed replacement. *Id.* at 624-25.

Without deciding the issue, the *Mielke* court found that a question of material fact existed on the "replacement" width and remanded the case accordingly. *Id.* The court held that the location of the pipeline's "replacement" was established by the scope of the original easement, and the doctrine of reasonable enjoyment established the width. *Id.* The court in *Mielke* merely followed the existing law established in *Rhoades* and *Everett Water Co. Id.* In *Mielke*, unlike the easement on Dickie's land, the plain language did not express intent to enlarge the scope of the easement over time. *Id.* at 622.

Several states have considered whether the scope of an easement can change over time to accommodate future demands. In the touchstone case from Oregon, the plaintiffs sought to enjoin the defendant from widening a large millrace (otherwise referred to as a canal) in the city of Eugene. *Patterson v. Chambers Power Co.*, 81 Or. 328, 159 P. 568 (1916). The millrace channeled water from the Willamette River through the city of Eugene to certain mills situated on 23 acres of mill property. *Id.* at 330. The plaintiffs owned valuable property along the banks of the

millrace. *Id*. at 331. After more than 48 years, the defendant sought to widen the millrace by 20 feet on each side, which would seriously impair the beauty and value of the plaintiffs' property. *Id*. The plain language of the easement granted the right to dig the millrace " 'as wide and deep as may be necessary' " for the mill operations. *Id*. at 332 (quoting deed). The defendant claimed the easement granted a right to widen the millrace indefinitely as the needs might require. *Id*. at 331-32. The plaintiffs argued the easement was void for being indefinite. *See id*. at 333-34.

Analyzing the easement as a contract, the *Patterson* court held the right-of-way was not indefinite when the true intent of the parties could be ascertained. *Id*. at 334. The court found the grantor did not want to grant more than future development may require and not until that requirement presented itself. *Id*. at 335. The grantor, therefore, restricted the easement width to the growth of the manufacturing industries supplied by the millrace. *Id*. The court analogized the grant to future indefinite demands specified in contingent contracts that are routinely enforced. *Id*. Also, relying on *Everett Water Co.*, the *Patterson* court indicated the grant was not indefinite because the grantor has just as much of a right to convey part of his or her interest in the land as the right to convey the whole. *Patterson*, 81 Or. at 337.

In *Collins v. Driscoll*, another case relied on by the *Patterson* court, the grantor permitted a grantee to dig a ditch as deep as desired. *Collins v. Driscoll*, 34 Conn. 43 (1867); *Patterson*, 81 Or. at 339-40. The *Collins* court held by implication that this included the foreseeable sloping of the ditch walls to prevent the sides from collapsing even though the sloping cut into the grantor's land. *Collins*, 34 Conn. at 47-48. The *Patterson* court held that easements would be enforced if the express terms manifest a clear intention by the original parties to modify the initial scope based on future demands. *Patterson*, 81 Or. at 340-41; *see also Carroll Elec. Coop. Corp. v. Benson*, 312 Ark. 183, 188,

848 S.W.2d 413 (1993) (allowing for the extension of power lines beyond the original placement because the easement expressly granted future extensions); *Utah Power & Light Co. v. Bishop*, 26 Utah 2d 60, 484 P.2d 1187 (1971) (granting the right to add power lines where the express language in the deed permitted additional lines into perpetuity); *Phillips Petroleum Co. v. Lovell*, 392 S.W.2d 748, 750 (Tex. App. 1965) (permitting the grantee to lay additional pipelines where the easement expressly granted the right to lay additional pipelines based on future demands); *cf. Fisher v. Palo Verde Irrig. Dist.*, 157 Cal. App. 2d 105, 109-10, 320 P.2d 95 (1958) (barring the widening of an irrigation canal because the deed contained no express provision to enlarge even though the area rehabilitation plan indicated a potential future need to widen).

We find *Patterson* and its progeny persuasive and hold that an easement can be expanded over time if the express terms of the easement manifest a clear intention by the original parties to modify the initial scope based on future demands. The face of the easement must manifest this clear intent. The four corners rule ensures subsequent purchasers have clear actual or constructive notice of the encumbrance based upon future demand. *See, e.g., Patterson*, 81 Or. at 333 (basing the holding in part on constructive notice to the purchasers); *Utah Power & Light Co.*, 26 Utah 2d at 61 (basing the allowance to expand future power lines in part on the defendant receiving actual or constructive notice). The easements on Dickie's properties grant "the right and permission to enter upon said land for the . . . *enlargement and repair of said . . . laterals, . . . and to . . . maintain and repair the same* . . . ." We find that this language manifests a clear intent to enlarge the lateral and its maintenance area based upon future demands.

Only when this intent is found should a court go to the next step of determining whether the proposed expansion is necessitated by the future demands contemplated by the original parties. To do this, we must determine the width of

the easement under the doctrine of reasonable enjoyment. Under this doctrine, the grantee is entitled to a width reasonably necessary to effectuate the original purpose of the easement. *Everett Water Co.*, 37 Wash. at 152.

The trial court found the original purpose of the lateral was to provide irrigation to the farming properties upstream and downstream from Dickie's properties and that the original parties likely anticipated expansion of the lateral to accommodate the projected growth from the Roza Division. The trial court's findings are supported by substantial evidence in the record. SVID showed that the lateral and the Roza Division were parts of the overall irrigation scheme referred to as the Yakima Reclamation Project, and that as early as 1905, the designers of it planned to develop the Roza Division which, after development, would expand the water capacity in the lateral. SVID, therefore, has a right to increase the lateral width to accommodate the increased demand of water and silt due to the upstream Roza Division. Like the court found in *Collins*, this right extends to expanding the shape of the existing lateral to the extent reasonably necessary to carry the additional flow from the Roza Division.

Dickie contends the easement language grants SVID only the right to enlarge the lateral itself and not the width of the easement as a whole because the easement language specifies "[the grantee has the] right and permission to enter upon said land for the . . . enlargement and repair of said . . . laterals . . . ." Dickie fails to consider the subsequent conjunction and adverbial phrase "and to . . . maintain and repair the same . . . ." This plain language indicates a right to enter upon the land for the maintenance and repair of the enlarged lateral. SVID is entitled to a maintenance area to accommodate the expansion of the lateral.

Dickie also contends that the increased capacity in the lateral does not grant SVID the right to expand its maintenance area to accommodate the use of slopers, backhoes and mowers. This argument is also unpersuasive. The

record is replete with evidence showing why power equipment is necessary for the maintenance of the lateral. First, chemicals are no longer allowed to control weeds and other growth that inhibit water movement in the lateral. Second, the capacity of the lateral has increased over time. Silt and other sediment must be efficiently removed from the bottom of the lateral to maintain the existing capacity. Third, farmland owners want uninterrupted water delivery during the irrigation season. Repairs of the lateral interrupt the water delivery to upstream and downstream users because it involves shutting down the lateral or modifying the current delivery. Fourth, farmland owners want to prevent sprinklers and drip systems from clogging.[2] Slopers are preferred because they minimize the turbidity in the water, reducing the risk of clogging. Fifth, in contrast to other equipment, slopers are much more efficient. They can clean several miles of the lateral in one day. In addition to efficiently removing sediment, slopers flatten the sediment at the top of the lateral's bank, preventing the blocking of airflow through the farmlands. Finally, obstructions within the lateral can cause problems of seepage that occur when the water level rises to a point where it escapes through permeable areas on the lateral walls and subbing that occurs when the water level rises up to or above the root zone. The use of slopers reduces the risk of these problems.

Dickie did not provide evidence to show that equipment used by SVID was unreasonable for performing maintenance operations on the lateral. Dickie also did not support the contention that the intent of the original landowners was to continue with human labor, horses and slips as used in the early years. SVID showed that slopers are commonly used to perform this type of work on the entire lateral system. SVID satisfied its burden of showing that the practical interpretation of the easements given the prior conduct of the parties was to provide efficient maintenance along the lateral system. This includes providing the unin-

---

[2] About 60 percent of the farmers in the area use sprinklers and drip systems.

terrupted flow of water during the irrigation season with minimal adverse impact to the local agricultural operations. The use of drip systems and sprinklers on the farmlands necessitates the use of efficient machines to maintain a high water quality to prevent clogging. We hold that SVID is entitled to use power equipment under the terms of its grants.

The final issue is whether SVID requires 20 feet from the lateral's center line to conduct its maintenance. Twenty feet from the lateral's center line is equivalent to 15 feet from the top edge of the lateral's bank. The wheelbase on the equipment is roughly 8 to 8-1/2 feet and the machinery must be set back 2 to 3 feet from the lateral's edge to ensure safe operation. This leaves the maintenance operator with only 4 to 5 feet to operate the machine. The trial judge extensively evaluated the area to ensure SVID was using no more area than reasonably necessary to accomplish its maintenance. This evaluation included witness testimony, a visit to the site and a survey of the property. The trial court's finding that SVID is entitled to 20 feet from the center line of the lateral is supported by substantial evidence in the record. It is also supported by the easement language granting "the necessary right-of-way for the . . . maintenance of all . . . laterals."

Dickie also challenges nine of the trial court's findings of fact, numbers 9, 20-21 and 23-28. Dickie's challenges primarily assert that floating easements can never change over time even for future demands. In light of our holding and the evidence in the record, these challenges are without merit.

Finally, it is unnecessary to reach Dickie's permanent injunction and state constitutional taking challenges because SVID was operating under the legal authority granted by the easements.

## CONCLUSION

A floating easement can be expanded over time if the express terms manifest clear intent by the original parties

to modify the initial scope based on future demands. Unless otherwise indicated (parties have just as much of a right to convey all of the interest in the land as the right to convey some), the expansion is not unbridled and must be reasonably within the anticipated expansion factors contemplated by the parties. Here, SVID met its burden by showing that the original parties anticipated future expansion through the development of the Roza Division. The lateral capacity has increased over time because of the Roza Division. SVID also showed that original parties likely anticipated efficient maintenance operations on the lateral to allow for uninterrupted delivery of water during the irrigation season. This is in the best interest of the users. SVID is entitled to a reasonable area to conduct its maintenance operations, which was carefully and systematically determined by the trial court to be 20 feet from the lateral's center line. Dickie did not demonstrate that the use of backhoes, slopers and mowers was unreasonable as compared with similar operations elsewhere. We affirm the Court of Appeals.

ALEXANDER, C.J., and JOHNSON, MADSEN, SANDERS, IRELAND, BRIDGE, CHAMBERS, and OWENS, JJ., concur.

Reconsideration denied October 27, 2003.