[No. 32943-3-II.   Division Two.   November 7, 2006.]

THE STATE OF WASHINGTON, *Respondent*, v. GORDON SMITH
BIRD, *Appellant*.

*Thomas E. Weaver, Jr.,* for appellant.

*Russell D. Hauge, Prosecuting Attorney,* and *Jeremy A. Morris, Deputy,* for respondent.

¶1 VAN DEREN, J. — Gordon Smith Bird appeals his conviction for assault in the first degree because the trial court erroneously counted his acceptance of the jury panel as one of his seven allotted peremptory challenges. He

asserts other errors as well, but because we reverse and remand for a new trial based on his timely objection to the trial court's admitted error denying his last peremptory challenge and because the error is not harmless when the objectionable juror actually deliberates, we address only the admission of statements under the excited utterance exception to the United States Constitution's Sixth Amendment right to confrontation, as that issue may arise on retrial.

## FACTS

¶2 Late on January 28, 2004, Jimmy Dobras and Nick Poling took a shortcut through Bird's yard. They walked up Bird's driveway, went through the carport, and attempted to open a gate. The gate had always opened in the past, but it did not open on this occasion because approximately 10 days earlier Bird had installed a solid fence.

¶3 Bird testified that he "heard a rattling of the doorknob." Report of Proceedings (RP) at 742. He surmised that "somebody had been trying to break into the house." RP at 744. Bird then grabbed a sword, opened the door, and told Dobras and Poling to "[g]et off of my property and don't come back." RP at 746. What subsequently occurred was related by numerous trial witnesses, including Dobras, Poling, Bird's neighbors, and Bird, without agreement on the sequence of events but with agreement that the confrontation ended when Bird stabbed Dobras with his sword. Poling was present during the confrontation and when Dobras was stabbed. Poling ran to a nearby friend's house and reported the stabbing. Dobras testified that when he returned to that same house, bleeding out of the wounds to both the front and back of his body, everyone at the house was in an "erratic state screaming and yelling." RP at 430-31.

¶4 Officer Frank Shaw responded to the scene and took statements from witnesses, including Poling. Poling resided in Baltimore, Maryland, at the time of trial and did not testify at trial, nor was he available for cross-examination before trial.

¶5 Shaw testified that the persons at the house " . . . were shook up." RP at 319. Shaw stated that Poling " . . . was—I wouldn't say out of breath, but he was obviously kind of excited. How I explain in my report, 'He was excited,' the way he acted." RP at 325. Shaw observed that Poling was talking "[k]ind of fast" and that he was talking "louder than normal speak." RP at 325. Poling told Shaw that Dobras had been stabbed and that "the sword went all the way through him." RP at 326. Shaw testified that after Poling made those initial statements to him, Shaw continued the interview and reported that Poling told him:

> The two [Dobras and Poling] cut through the yard [Bird's yard] and discovered a fence that had been put up. They turned around and started back to Montgomery [Avenue] when Mr. Bird came out. . . . The male, later [identified] as Gordon Bird, lunged forward and stabbed Dobras in the chest. Poling said it happened so fast he didn't even know Dobras had been stabbed at first. The two then ran towards the house, 2145-11th Street and Dobras fell behind Poling. Poling checked back on him and discovered Dobras had been stabbed. He then ran into the house and yelled to the others in the house that Dobras had been stabbed. . . . I asked Poling what the suspect looked like then he described an older white male with a beard wearing a gray hooded jacket.

RP at 333-34.

¶6 On January 29, 2004, the Kitsap County Prosecutor charged Bird with one count of assault in the first degree. At trial, Bird and the State each had seven peremptory challenges.

¶7 They exercised them as shown:

| State | Bird |
|---|---|
| 1. Juror No. 4 | 1. Juror No. 2 |
| 2. accepts the panel as seated | 2. Juror No. 10 |
| 3. accepts the panel as seated | 3. Juror No. 17 |
| 4. accepts the panel as seated | 4. Juror No. 26 |
| 5. Juror No. 27 | 5. Juror No. 28 |
| 6. Juror No. 29 | 6. accepts the panel as seated |
| 7. Juror No. 30 | 7. Juror No. 31 |

¶8 The court then informed both parties that they had exhausted their peremptory challenges:

> THE COURT: Mr. Mitchell [prosecutor], unless my count is inaccurate, you are complete.
>
> MR. MITCHELL: I have, your Honor.
>
> THE COURT: Mr. Longacre [Bird's defense attorney], unless I'm inaccurate in my math, you are completed as well, I think.
>
> MR. LONGACRE: Let me double check though.
>
> THE COURT: I've got seven.
>
> MR. LONGACRE: My math could be wrong, because I'm one different.
>
> THE COURT: The clerk has got you with all seven.
>
> MR. LONGACRE: All seven.
>
> THE COURT: Do you want to check her notes?
>
> MR. LONGACRE: No, she's accurate.

RP at 221. The trial court then dismissed the remaining jurors and welcomed those seated for trial. But defense counsel requested a sidebar before the seated jurors were sworn by the court. The court made a record of the sidebar discussion:

> THE COURT: The second sidebar we had was after the peremptory challenges had been made and the balance of the jurors had been excused and I was just getting ready to swear in the panel, Mr. Longacre asked for a sidebar. It related to the question of whether the choice to quote-unquote, "accept the panel," counted as one of the peremptory challenges, i.e., each side is entitled to have seven.
>
> It has been my practice to count an "accept" as a peremptory challenge so that Mr. Mitchell, I think, exercised three of those, . . . and so he had seven times at bat, so to speak . . . .
>
> Mr. Longacre counted his peremptory challenges different and so he believed that he only had six exercised and he wanted to, I presume, excuse Juror No. 32 because of where he was in his challenges and seat No. 33.

I said that my practice was to count those for both sides so that each side had seven and put that on the record. I also told him that we would go on the record afterwards to talk about it.

Now, Mr. Mitchell, from your perspective, is there anything we need to supplement to either of those sidebar recitations?

MR. MITCHELL: I don't believe so, your Honor.

THE COURT: Mr. Longacre.

MR. LONGACRE: That covers it, your Honor. My position, I had one more and I wanted to seat No. 33, but I think with the court's ruling, acceptance is counted as a peremptory challenge, that ended the issue of me attempting to seat 33 at that point.

RP at 230-31.

¶9 On February 2, 2005, a jury convicted Bird of assault in the first degree. Before sentencing, the trial court denied Bird's motion for a new trial based on the trial court's denial of his last peremptory challenge but realized that its practice of counting an acceptance of the jury panel as a peremptory challenge was erroneous under Criminal Rule (CrR) 6.4(e)(2).[1] The trial court noted that CrR 6.4(e)(2) "seems to say quite clearly that acceptance or pass or whatever language Mr. Longacre used does not waive his right to have seven peremptory challenges." RP at 902-03. The trial court ruled that although Bird did not waive his right to challenge an additional juror, he waived his objection to the trial court's material departure from the established standards applicable to the exercise of peremptory challenges.

¶10 The trial court also denied Bird's motion because it found no evidence of prejudice warranting a new trial:

In this case, I don't think I have any evidence of prejudice other than what could be presumed from the fact that the person that the defense wanted seated didn't get seated, but as Mr. Longacre and I have both pointed out then—if I had been following the rules, then Mr. Mitchell would have had a chance

---

[1] CrR 6.4(e)(2) states: "Acceptance of the jury as presently constituted shall not waive any remaining peremptory challenges to the jurors subsequently called."

to get that person off, and we don't know anything about Juror No. 34 or 24. So in view of the odd circumstances surrounding this case, I'm going deny the defense request for a motion for a new trial.

RP at 915.

¶11 Bird appeals.

## ANALYSIS

### I. Peremptory Challenges

¶12 Bird argues that the trial court erred by counting his acceptance of the jury panel as one of his seven peremptory challenges. We agree.

██ ¶13 Whether Bird must object to the denial of peremptory challenge and whether that denial was harmless are questions of law. Questions of law and conclusions of law are reviewed de novo. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003).

██ ¶14 The State concedes that Bird was entitled to seven peremptory challenges under CrR 6.4 and CrR 6.5 and that, under CrR 6.4(e)(2), acceptance of the panel does not constitute waiver of any remaining peremptory challenges. Furthermore, the State concedes that under *State v. Vreen*, 143 Wn.2d 923, 26 P.3d 236 (2001), the erroneous denial of a litigant's peremptory challenge cannot be harmless when the objectionable juror actually deliberates. *Vreen*, 143 Wn.2d at 932. Instead, the State argues that "[t]o preserve judicial error for appeal, however, a timely objection must be made, otherwise a party waives his right to make such a challenge on appeal. *State v. Wicke*, 91 Wn.2d 638, 642, 591 P.2d 452 (1979)." Br. of Resp't at 10.

¶15 But the State's argument is based on an inaccurate reading of *Wicke*, which states:

> In order to preserve error for consideration on appeal, the general rule is that the alleged error must be called to the trial court's attention at a time that will afford the court an opportunity to correct it. *State v. Fagalde*, 85 Wn.2d 730, 539 P.2d 86 (1975). Ideally, this will be done during the course of trial, *but the error may be raised in a motion for a new trial.* [*City of*]*Seattle v. Harclaon*, 56 Wn.2d 596, 354 P.2d 928 (1960).

*Wicke,* 91 Wn.2d at 642 (emphasis added). Bird raised the trial court's error at the conclusion of voir dire and in his motion for a new trial. The objection was timely made and allowed the trial court to correct its error by seating a new venire for jury selection after each party exercised or clearly waived its seven peremptory challenges. *See Wicke,* 91 Wn.2d at 642. Thus, the issue was preserved for appeal.

¶16 As the State concedes and as our Supreme Court has held: " 'Any impairment of a party's right to exercise a peremptory challenge constitutes reversible error without a showing of prejudice. As such, harmless error analysis does not apply.' " *Vreen,* 143 Wn.2d at 931 (quoting *State v. Evans,* 100 Wn. App. 757, 774, 998 P.2d 373 (2000)).

¶17 Here, the trial court admitted that it erroneously denied Bird his final peremptory challenge. Due to this error, the objectionable juror sat on the jury that convicted Bird. Accordingly, the trial court's error mandates reversal for a new trial without a showing of prejudice.

¶18 We address Bird's challenge to admission of his interview statements because the issue may arise on retrial.

## II. Testimonial Statements and Excited Utterances

¶19 Bird concedes that the statements that "Jimmy's been stabbed" and "the sword went all the way through him" were excited utterances and an exception to the Sixth Amendment's confrontation clause, but argues that the interview following those statements is not excepted by the hearsay rules from the right of confrontation because Shaw's interview was for the purpose of litigation. RP at 328.

¶20 The trial court found that Poling was present when the stabbing occurred and determined that it was "a startling event under the rule and his demeanor as reported by Officer Shaw indicates he was still under the stress of the event, he was breathless, excited, loud talking, fast talking." RP at 336. The trial court concluded that the statements Poling made in response to Shaw's questions were spontaneous and that there was no indication that "Poling

stopped, considered what he said, that there were any pauses." RP at 337.

¶21 Bird asserts that without Poling testifying and without a prior opportunity to cross-examine him, Shaw's testimony about what Poling told him after the initial statements violates Bird's Sixth Amendment right of confrontation.

¶22 The State argued that Shaw's answers to the following questions indicated that Poling's interview responses were excited utterances:

Q. When you spoke with Nicholaus Poling and asked him the rendition of basically what happened—when you asked the questions, did he pause before he responded to you, that you remember?

A. No.

Q. Is there any reason in your mind to think that [Poling] may have had time to fabricate or create any stories with regard to any responses?

A. No.

RP at 329.

¶23 The trial court treated all of Poling's statements to Shaw as excited utterances not subject to Sixth Amendment analysis and admitted them over Bird's objection. Bird argues that the statements attributed to Poling after the initial utterances were not spontaneous excited utterances because they were made only in response to Shaw's questions and were testimonial for the purposes of his Sixth Amendment right to confrontation. Br. of Appellant at 140 (citing *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)).

¶24 We review the trial court's ruling on the admissibility of evidence for abuse of discretion. *State v. Ohlson*, 131 Wn. App. 71, 76, 125 P.3d 990 (2005). "A trial court abuses its discretion when its decision is manifestly unreasonable or is based on untenable grounds or reasons." *Ohlson*, 131 Wn. App. at 76.

¶25 An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2). "Three requirements must be met for a statement to qualify as an excited utterance: (1) a startling event or condition must have occurred; (2) the statement must have been made while the declarant was under the stress of excitement caused by the event or condition; and (3) the statement must relate to the startling event or condition." *Ohlson*, 131 Wn. App. at 76-77 (citing *State v. Chapin*, 118 Wn.2d 681, 686, 826 P.2d 194 (1992)).

¶26 The State relies on *Ohlson* in arguing that all of Poling's statements were excited utterances and, because excited utterances are never testimonial, they do not violate the Sixth Amendment right of confrontation. But the recent United States Supreme Court discussion of what constitutes a testimonial statement is contrary to *Ohlson*'s per se rule. *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

¶27 The Sixth Amendment's confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The United States Supreme Court has held that this bedrock procedural guaranty applies to both federal and state prosecutions. *Crawford*, 541 U.S. at 42 (citing *Pointer v. Texas*, 380 U.S. 400, 406, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965)).

¶28 When evidence is testimonial, the Sixth Amendment demands that the declarant be available or that the defendant had an opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 68. But in *Crawford*, the United States Supreme Court specifically chose not to provide a definition for "testimonial." *Crawford*, 541 U.S. at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' "). It took the issue up again in *Davis*, where it held that statements made in the course of a police interrogation are *nontestimonial* if the primary purpose of the interrogation is to enable police

assistance to meet an *ongoing emergency*. *Davis*, 126 S. Ct. at 2273. Statements made in the course of a police interrogation are *testimonial* if the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution and there is *no ongoing emergency*. *Davis*, 126 S. Ct. at 2273-74.

¶29 In *Davis*'s consolidated case, the defendant, Hammon, was physically moved to another room and separated from the declarant (his wife) when she gave her statement to the police. *Davis*, 126 S. Ct. at 2272. The Court noted that her statements recounted how potentially criminal past events began and progressed and that the statements took place some time after the described events were over. *Davis*, 126 S. Ct. at 2278. The Court held that the statements were made under official interrogation and were an obvious substitute for live testimony because they did precisely *what a witness does* on direct examination and that they were inherently testimonial. *Davis*, 126 S. Ct. at 2278.

¶30 Here, the trial court did not distinguish between Poling's initial statements and those made during the following interview. When Shaw first encountered Poling, he was under stress of the confrontation with Bird and Dobras's stabbing. He was excited in the way that he acted, he was talking "kind of fast," and he was "talking louder than normal speak." RP at 325. Shaw testified that when he interviewed him later, Poling did not pause before responding to questions and that he believed that Poling did not have time to fabricate or create stories based on Shaw's questions.

¶31 We agree with the trial court that Poling was still under the influence of a startling event and that his demeanor indicated that he was still under the stress of the event when Shaw first encountered Poling. But there was no ongoing emergency when Shaw questioned Poling thereafter. Rather, Shaw's questions were to determine how Dobras was stabbed and who did it. Unlike the declarant in

138

*Davis,* who was making a 911 call and was facing an ongoing emergency,[2] Poling was answering questions after the cessation of the startling event. His answers led to Bird's prosecution and his answers were testimonial. Whether he paused before answering questions or whether Shaw believed Poling did not have time to fabricate or create a story is not determinative of the nature of his statements, and the trial court erred when it admitted this portion of Shaw's discussion with Poling.

¶32 We reverse and remand for a new trial.

HOUGHTON, C.J., and QUINN-BRINTNALL, J., concur.

Review denied at 161 Wn.2d 1013 (2007).

<hr>

[2] The declarant in *Davis,* McCottry, was on the telephone with the 911 operator describing her boyfriend (Davis) beating her while Davis was still on the premises. *Davis,* 126 S. Ct. at 2271. McCottry's statements enabled the police to resolve the existing emergency rather than learn what had happened before the 911 call. *Davis,* 126 S. Ct. at 2276.