IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| DONALD J. NOBLE, a single man,<br><br>     Appellant,<br><br>    v.<br><br>ROBERT C. WOLFORD and JANE DOE WOLFORD, husband and wife,<br><br>     Respondents. | No. 84728-7-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

   SMITH, C.J. — In 2010, Donald Noble inherited two parcels of land from his parents. After failing to pay property taxes, Noble received notice that he was in danger of foreclosure. Unable to pay the debt himself or obtain a loan, Noble turned to Robert Wolford, his employer, for help. In 2014, in exchange for Wolford paying the tax debt, Noble executed quitclaim deeds for the parcels. Noble never repurchased the property. In 2021, Noble sued Wolford, alleging that the transaction constitutes an equitable mortgage and seeking an order quieting title. The trial court denied all of Noble's claims. On appeal, Noble argues the court erred in concluding there was no equitable mortgage and that the agreement both violated the real estate statute of frauds and was substantively and procedurally unconscionable. Finding his arguments unpersuasive, we affirm.

FACTS

In 2010, Donald Noble inherited two parcels of land in Granite Falls, Washington ("the property"). The property was Noble's childhood home, which he later received by way of a quitclaim deed when his father died. He took the land clear of any debt or mortgage.

In 2014, Noble received notice that the property was two months away from being auctioned off in a tax foreclosure sale because he had failed to pay the property taxes. As Noble had missed the date to initiate a payment plan, Snohomish County required he pay the entire tax debt, totaling $23,587.60.

Noble attempted to secure a loan through a number of sources but was unable to do so. Noble grew increasingly anxious and reached out to his coworker, Scott Miller, in late 2014. Miller, while unwilling to finance the loan himself, offered to contact their employer, Robert Wolford. Miller informed Noble that Wolford would loan Noble the money and then Noble could take out a home loan to repay him the full amount, plus $5,000 in interest. Noble accepted this plan and met Wolford at the county assessor's office on the morning of the foreclosure sale.

At the assessor's office, Wolford told Noble that he would only pay the property taxes if Noble deeded the land to him. He then presented two quitclaim deeds that his attorney, his girlfriend at the time, had prepared. Noble signed the deeds. Wolford then paid the property taxes. At the time Noble signed the

2

deeds, the property had an assessed value of $219,500. Wolford received the property for $23,587.60, which was 11 percent of the assessed value.[1]

A few weeks after the foreclosure sale, Wolford presented Noble with a "rent to own agreement" with an effective date of December 31, 2014. Per the agreement, Noble could repurchase the property for $48,795.92, provided he exercised this "option to purchase" by April 30, 2015.[2] Noble attempted to secure a loan to pay Wolford but was again unsuccessful. Noble did not exercise his option to purchase by April 2015, but continued to live on the property and pay rent. Wolford continued to pay all of the taxes on the property.

Noble's rent took the form of withholdings from his paycheck. These withholdings were labelled "employee long term loan." And although Noble was injured in a work accident in August 2019 and instructed by the Department of Labor and Industries not to work, he continued to work "under the table" to pay rent. Noble testified at trial that Wolford regularly threatened the sell the house if Noble refused to work.

In October 2021, Wolford sent Noble notice of an increase in rent, followed by a letter instructing him to disregard the increase in rent and informing

---

[1] Wolford likely would have been able to buy the property at a similar amount had the foreclosure sale gone forward. Snohomish County would not have been able to keep any extra money it made on the sale, meaning it would have sold the property for the amount of the outstanding tax debt anyway. Tyler v. Hennepin County, Minnesota, 598 U.S. 631, 639, 143 S. Ct. 1369, 215 L. Ed. 2d 564 (2023).

[2] The agreement, which was effective as of December 31, 2014, stated that Noble must exercise the option to purchase by April 31, 2014. Since this date precedes the effective date of the agreement, it appears to be a typographical error.

him that his tenancy had been terminated.  Noble then sued for an equitable mortgage and quiet title, as well as requesting a preliminary injunction staying the eviction process and prohibiting marketing the property or any adverse employment action.  While the lawsuit was pending, the court granted Noble's preliminary injunction as to the eviction and marketing of the property, but denied it as to his employment.  Within hours of the court granting the injunction, Wolford attempted to raise the rent from $1,850 to $5,000 a month.  In February 2022, Wolford terminated Noble's employment.  Noble continued to live on the property.

In August 2022, Noble's equitable mortgage claim proceeded to trial. Noble testified that he did not intend to use the land as collateral and that, had Wolford specifically asked for a mortgage to the secure the loan, he was not sure if he would have agreed.  Wolford testified that he never intended that the loan constitute a mortgage.  The court concluded that Noble failed to prove the existence of an equitable mortgage by clear and convincing evidence.

Noble appeals.

## ANALYSIS

### Standard of Review

We review findings of fact for substantial evidence.  Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003).  Substantial evidence is evidence sufficient to convince a rational-minded person of the assertion's truth. Dickie, 149 Wn.2d at 879.  If the fact at issue must be shown by clear and convincing evidence, substantial evidence must show the fact is highly probable.

In re Dependency of A.M.F., 23 Wn. App. 2d 135, 141, 514 P.3d 755 (2022).  We review legal questions de novo.  A.M.F., 23 Wn. App. 2d at 141.[3]

### Equitable Mortgage

Noble asserts that the court erred in concluding no equitable mortgage existed when it determined there was no intent to establish one.  Wolford contends that the court could not have found an equitable mortgage existed when both Noble and Wolford testified that there was never an intent to create one.  We agree with Wolford.

The doctrine of equitable mortgage allows a court to reform a transaction to match the intention of the parties.  Beverly v. Davis, 79 Wash. 537, 539-40, 140 P. 696 (1914).  "Where the transactions actually occurring between the parties are clearly of such a nature as to show a deed absolute in form to have been a mortgage, courts of equity will construe it as such."  Plummer v. Ilse, 41 Wash. 5, 11, 82, P. 1009 (1905).  Put another way, if the parties *intended* the transaction to be a mortgage, the court may consider the transaction to be a mortgage, regardless of the paperwork.  Plummer, 41 Wash. at 11.  And the court will look beyond the face of that paperwork, considering all surrounding circumstances to determine intent.  Parker v. Speedy Re-Finance, Ltd., 23 Wn. App. 64, 70, 596 P.2d 1061 (1979).

---

[3]  Noble also asserted on appeal that the quitclaim deeds did not satisfy the real estate statute of frauds, chapter 64.04 RCW, because they were not signed in the presence of a notary.  In general, we do not consider issues raised for the first time on appeal.  RAP 2.5(a).  As he failed to raise the issue below, we decline to reach it.

Noble argues that he intended to create a mortgage and that the court should have inferred his intent to do so. He contends that his intent to create a mortgage undermines both the quitclaim deeds and "rent to own" agreement. But while a court may infer intent, here, the sticky wicket is that both Wolford and Noble testified they had *no* intent to create a mortgage. Noble provides no authority to suggest a court should infer intent over explicit testimony to the contrary.

Noble testified more than once that he did not intend to use the property as collateral for a loan. During direct examination, Noble testified that if Wolford had asked for a mortgage to secure his loan, he was not sure if he would have agreed. Wolford similarly testified that he never intended the transaction to be a mortgage. With explicit testimony from both parties denying an intent to create a mortgage, we conclude that the trial court did not err in finding that Noble failed to establish an equitable mortgage by clear and convincing evidence.

<u>Unconscionability</u>

Noble next argues that the quitclaim deeds, if not categorized as a mortgage, are both procedurally and substantively unconscionable. Wolford counters that Noble waived this issue. We conclude that Noble did not waive the issue, as an equitable mortgage is a remedy for unconscionability, but we disagree that the agreement actually was unconscionable. The quitclaim deeds were neither one-sided nor monstrously harsh and Noble had the opportunity to understand the deal. Similarly, the "rent to own" agreement was not one-sided or harsh and did not leave Noble without any meaningful choice.

6

Unconscionability is a feature of contract law, which we review de novo. Adler v. Fred Lind Manor, 153 Wn.2d 331, 344, 103 P.3d 773 (2004); McKee v. AT&T Corp., 164 Wn.2d 372, 383-84, 191 P.3d 845 (2008). When analyzing substantive unconscionability, courts look to whether a contract is one-sided or overly harsh. Adler, 153 Wn.2d at 345. When considering procedural unconscionability, courts look to "(1) the manner in which the contract was entered, (2) whether [the parties] had a reasonable opportunity to understand the terms of the contract, and (3) whether the important terms were hidden in a maze of fine print, to determine where a party lacked a meaningful choice." Burnett v. Pagliacci Pizza, Inc., 196 Wn.2d 38, 54, 470 P.3d 486 (2020).

Here, Noble argues that the power imbalance and quick turnaround time of the quitclaim deeds establish substantive unconscionability, while the agreement is procedurally unconscionable because it is a "maze of fine print" that stripped Noble of any meaningful choice. Noble, however, improperly conflates the documents. Noble signed the quitclaim deeds with the understanding that, in return, Wolford would pay the property taxes so Noble would be in a position to buy the property back rather than lose it to foreclosure. That said, Wolford was under no obligation to provide a "rent to own" agreement to make that possible. He could have simply had Noble lease the property until he was able to purchase it. Accordingly, the language of the "rent to own" agreement should not affect the unconscionability of the quitclaim deeds, and vice versa. We analyze the deeds and the agreement separately to determine unconscionability.

*a.  Quitclaim Deeds*

The quitclaim deeds were not unconscionable because they were neither one-sided nor monstrously harsh and Noble had reasonable opportunity to understand the deal.

Noble argues that the circumstances surrounding the deeds are one-sided because they stem from a power imbalance between Noble and Wolford.  We disagree.  Here, Noble initiated the entire transaction.  When Noble discovered he was two months away from losing his property, he sought funding in a variety of different ways.  He started with his bank, reached out to individual money lenders, and eventually turned to asking friends.  Finally, Noble, by way of Miller, requested Wolford's help.  Wolford stepped in to help, and likely, to make a little money.  He did not use his power as Noble's employer to force his hand.

And the deeds themselves were not one-sided or monstrously harsh.  It is important that we do not take the deeds out of the context in which they were signed.  Wolford offered the quitclaim deeds as part of an oral agreement that allowed Noble to buy his property back, for the price of $5,000, on top of the taxes and fees that Wolford paid to save the property.  This is a balanced transaction.  Noble retained the ability to live on his property and the opportunity to buy it back for a reasonable price.  Wolford gained collateral, in the form of the quitclaim deeds, with an eventual $5,000 payout.  Without the quitclaim deeds as collateral, there would have been nothing to guarantee that Noble would ever pay Wolford back.  Therefore, the deeds were essential in balancing the transaction.

It is also worth noting that, though Wolford bought the property for well below its assessed value, another buyer would likely have been able to obtain the property for a similar amount had the County gone through with the tax foreclosure sale.  Under these circumstances, the amount that Wolford paid in exchange for the quitclaim deeds does not make the deeds substantively unconscionable.

As for procedural unconscionability, the issue centers on whether Noble had reasonable opportunity to understand the terms of the deal.  We conclude that he did.  Noble points to the quick turnaround time that Wolford presented for Noble to sign the deeds.  And while there was a limited time frame, Noble provides no evidence that the language in the quitclaim deeds was so overly complicated as to hide important terms or that he had no understanding of what he was signing.  In fact, the record indicates that Noble understood the ramifications of signing the quitclaim deeds.  There is no requirement that a party have ample time to debate, just that there is a reasonable opportunity to understand.  Noble had the latter.

b.  *"Rent to Own" Agreement*

Similarly, the "rent to own" agreement was neither substantively nor procedurally unconscionable.  The agreement benefitted Noble by allowing him to stay on the property and providing him with a way and some time to purchase it back, and was not one-sided, overly harsh, or unnecessarily complicated.

Noble contends that the agreement is procedurally unconscionable because the document is a "maze of fine print."  This argument is unpersuasive

9

for two reasons. First, Noble had more than enough time to understand and sign the agreement. Proffered in December of 2014, Noble had until April of 2015 to sign on and find a loan. This is clearly sufficient time for Noble to read through and understand the terms of the agreement. And second, despite Noble's assertions, no evidence exists that the font size of the agreement impeded his ability to understand the agreement. The agreement was not so complicated as to hide important details and negate any meaningful choice.

Noble also asserts that Wolford used his authority as Noble's employer to force him to sign the agreement after "outrageously" increasing the sales price, making the agreement substantively unconscionable. But this ignores, again, both the fact that Noble instigated the entire transaction and that Wolford testified as to asking for only $5,000. Noble sought other funding before allowing Miller to set up the deal with Wolford. Wolford did not seek out the interaction, much less use his role as Noble's employer to force Noble's hand. And although the language of the "rent to own" agreement required Noble to pay $48,795.92 to repurchase the property, Wolford, Noble, and Miller all testified that Wolford would only charge Noble $5,000 on top of the tax debt. There is a reasonable chance that the $48,795.92 requirement was a typographical error, especially since there was already one mistake in the document. But even if Wolford did raise the price, he was still only asking for 21 percent of the value of the property. This is not monstrously harsh.

Attorney Fees

Both parties request attorney fees on appeal. Noble concedes that there is no statute or contract providing for an award of fees here, but requests fees based on equity. Wolford requests attorney fees under RCW 59.18.290, which allows for the recovery of reasonable fees following unlawful detainer. We decline to award fees to either party.

1. Equitable Fees

Attorney fees are generally not recoverable by the winning party unless the recovery of fees is permitted by contract, statute, or a recognized ground in equity. McGreevy v. Or. Mut. Ins. Co., 128 Wn.2d 26, 35, 904 P.2d 731 (1995).

Noble concedes that there is no contract or statute here. Instead, he requests fees based on equity, pointing to the disparity of bargaining power between Noble and Wolford and Wolford's "grossly inequitable, outrageous, and unfair behavior." Because Noble is not the prevailing party on appeal, we decline to award Noble fees.

2. Unlawful Detainer

Unlawful detainer exists when a tenant maintains control over or excludes the landlord from property after the termination of a rental agreement. RCW 59.18.290(2). In such a circumstance, the prevailing party may recover reasonable attorney fees. RCW 59.18.290(2).

Noble maintained control of the property beyond the termination of his rental agreement. However, Wolford has yet to bring an action for unlawful

detainer.  As he provides no other basis upon which to award fees, we decline to award Wolford attorney fees on appeal.

We affirm.

_____
Smith, C.J.

WE CONCUR:

_____        _____
Chung, J.                                Hazelrigg, A.C.J.