IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of:<br><br>D.L. | No. 88004-7-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BUI, J. — The superior court ordered D.L. committed for 14 days of involuntary commitment. D.L. appeals the order, arguing that there was not substantial evidence to support the superior court's finding that she was gravely disabled. We disagree and affirm.[1]

FACTS

On March 6, 2025, D.L. was involuntary detained when case workers at St. Margaret's Place, a supportive living facility where D.L. had been living since November 2023, filed an initial petition to have her evaluated for involuntary treatment. In their declarations, the case workers stated D.L. had deteriorated in her baseline function and cited examples of missing medical appointments to manage her diabetes, incontinence, and urinating, defecating, and disrobing in

---

[1] Because an involuntary commitment order may have adverse collateral consequences on future involuntary commitment determinations, this case is not moot even though the commitment order has since expired. See In re Det. of M.K., 168 Wn. App. 621, 629, 279 P.3d 897 (2012); RCW 71.05.245(3).

the common areas. They noted her living area was in disarray, with open food containers and clothes that appeared to be feces-soiled.

D.L. was transferred to the University of Washington Medical Center, Northwest Campus (UW Hospital), where she was evaluated by clinical social worker and court evaluator Joshua Cook. Based on that examination, Cook opined that D.L. was gravely disabled and filed a petition for 14-day involuntary treatment pursuant to the "Involuntary Treatment Act" (ITA), ch. 71.05 RCW. Subsequently, a probable cause hearing was held on March 20, 2025, to determine the merits of the petition.

Cook was the only witness to testify at the hearing. His testimony was based on his personal observations of D.L. and review of the caseworkers' declarations and medical charts. He testified D.L. had a diagnosis of dementia or an early onset of a major neurocognitive disorder. During his personal interviews and interactions with D.L., her recollection of dates and times was inaccurate, such as indicating the wrong month and year, and when he asked how she will meet her needs, she provided one-word responses, like saying the word "safe."

Cook's testimony also included the medical chart notes from UW Hospital, which he read into the record. D.L. refused insulin, urinated all over the floor, was unable to describe where she lived, had difficulty answering orientation questions and word-finding. She also exhibited severe memory deficits, such as inability to recall events occurring earlier on the same day and to recall staff members who assisted her daily.

2

Based on his personal observations, review of the petition for initial detention, and entries from D.L.'s medical chart from UW Hospital, Cook opined that D.L. was gravely disabled as defined in RCW 71.05.020(25)(a). Cook based his opinion on the struggles and deterioration D.L. experienced at St. Margaret's Place prior to her admission at UW Hospital, her inability to manage her own needs even with extensive staff assistance in the hospital and observed memory deficits and disorientation. Cook indicated that UW Hospital provided a significantly higher level of care than St. Margaret's Place. However, Cook noted that despite the increased level of care, D.L. struggled to manage her own health and safety needs without extensive staff prompting and assistance in a secure environment. Cook consequently recommended that D.L. be treated for 14 additional days, so the hospital could stabilize D.L. and either arrange additional support at St. Margaret's Place or find her new supportive housing with a higher level of care.

The trial court found D.L. was gravely disabled under subsection (a), as a result of her behavioral health disorder, she was in danger of serious physical harm due to an inability to provide for her essential needs of health and safety, and a less restrictive alternative treatment[2] was not in her best interest. The trial court ordered D.L. involuntary committed for 14 additional days. D.L. timely appealed.

---

[2] A "less restrictive alternative treatment" is a program of "individualized treatment in a less restrictive setting than inpatient treatment." RCW 71.05.020(35).

ANALYSIS

D.L.'s only contention on appeal is that substantial evidence does not support the trial court's finding that she was gravely disabled.

"Generally, where the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986) (citing Ridgeview Properties v. Starbuck, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982)). " 'Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person.' " In re Det. of A.F., 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021) (quoting In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015)). In considering whether there was sufficient evidence, we review the evidence in the light most favorable to the petitioner. In re Det. of A.M., 17 Wn. App. 2d 321, 330, 487 P.3d 531 (2021) (citing In re Det. of B.M., 7 Wn. App. 2d 70, 85, 432 P.3d 459, review denied, 193 Wn.2d 1017, 444 P.3d 1185 (2019)). "We do not review a trial court's decision regarding witness credibility or the persuasiveness of the evidence." A.F., 20 Wn. App. 2d at 125. "The burden is on the challenging party to demonstrate that substantial evidence does not support a finding of fact." In re Det. of T.C., 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019).

Involuntary commitment for behavioral health disorders "is a significant deprivation of liberty" which requires "due process of law." LaBelle, 107 Wn.2d at 201. "In general, an individual may be involuntarily committed for mental health

4

treatment if, as a result of a mental disorder, the individual either (1) poses a substantial risk of harm to him or herself, others, or the property of others, or (2) is gravely disabled." In re Det. of M.K., 168 Wn. App. 621, 630, 279 P.3d 897 (2012). Here, the superior court ordered D.L.'s commitment after finding her gravely disabled.

RCW 71.05.020(25) provides for two definitions of gravely disabled. The trial court relied only on subsection (a). RCW 71.05.020(25)(a) provides:

> In order to avoid the erroneous commitment of such persons under the gravely disabled standard, the State must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded. Furthermore, the failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors.

LaBelle, 107 Wn.2d at 204-05. These strict requirements are designed to mitigate the "danger of imposing majoritarian values on a person's chosen lifestyle which, although not sufficiently harmful to justify commitment, may be perceived by most of society as eccentric, substandard, or otherwise offensive." LaBelle, 107 Wn.2d at 204. "Although uncertainty of living arrangements or lack of financial resources will not alone justify continued confinement in a mental hospital," evidence supported involuntary treatment where it indicated that the subject of the petition "plans to live on the streets are not the result of a choice of lifestyle but rather a result of his deteriorated condition which rendered him unable to make a rational choice with respect to his ability to care for his essential needs." LaBelle, 107 Wn.2d at 210. However, the risk of harm need not

be imminent at the time of the 14-day probable cause hearing. LaBelle, 107 Wn.2d at 203.

D.L. claims there is insufficient nonspeculative, nonhearsay evidence to support the finding of grave disability. We disagree. Although some testimony was not admitted as substantive evidence based on hearsay objections, Cook's personal observations, which were not objected to, established that D.L. presented with a complicated major neurocognitive disorder. Her symptoms included "disorientation in three out of four assessed spheres," "severely impaired memory," and inability to independently attend to her daily living, health, and safety needs. His observations also indicated that D.L. had no meaningful release plan. When he asked how D.L. would meet her needs, she provided one-word responses, "like just saying the word 'safe.' " D.L. also struggled to meaningfully interact with the UW Hospital environment, a more intensive care facility. She was unable "to recall helping professionals," and "events earlier in the day."

D.L.'s medical records, which were admitted as substantive evidence, further support Cook's personal observations. At UW Hospital D.L. urinated on the floor, was incontinent and sometimes refused assistance changing her diaper, was unable to recall her address, the city she lived in, or the date, and refused insulin despite having high blood glucose levels. The substantive evidence presented at the probable cause hearing supports D.L. was gravely disabled under subsection (a). She suffered from a behavioral health disorder, specifically a major neurocognitive disorder, exhibited failure to provide for her

essential needs of health and safety, and had extreme difficulty managing health concerns, hygiene, and articulating a plan to stay safe in the community. See RCW 71.05.020(25)(a).

Turning to D.L.'s contention that there was insufficient nonspeculative evidence that she was gravely disabled, we disagree that Cook's testimony about the likelihood of harm to D.L. resulting from immediate release was based on speculation. Cook opined that D.L. should be involuntarily treated for an additional 14 days because her observed symptomology could potentially result in her becoming lost in the community, or harmed by individuals, and further decompensation. As stated above, the trial court does not need to find a person is in "imminent" danger as a result of their grave disability in order to commit them for involuntary treatment. Labelle, 107 Wn.2d at 203. Therefore, Cook's testimony did not need to articulate current danger D.L. faced in order to demonstrate a danger of serious physical harm resulting from a grave disability. See RCW 71.05.020(25)(a). The evidence on the record is sufficient to support that D.L. was gravely disabled pursuant to the ITA.

D.L. cites examples to support her argument that there was insufficient evidence that she was gravely disabled such as the chart notes and Cook's positive descriptions of D.L.'s demeanor, and good physical health and hygiene. Cook testified D.L. appeared well-nourished and in good physical health and had no major medical issues. In chart notes and during Cook's personal observations, D.L. was described as calm, pleasant, cheerful, and approachable, with "no real behavioral concerns." One chart note even indicated that she was

7

alert, followed commands appropriately, had fluid speech, and moved without difficulty. She also articulated a desire to return to St. Margaret's Place following her release from commitment, and there was no testimony she could not return there.

To be sure, there was evidence presented that touched upon D.L.'s ability to address her health and safety needs. Importantly, however, the trial court found that there was sufficient evidence D.L. could not independently take care of herself without intensive instruction or direction. As previously mentioned, there was admissible testimony that D.L. refused insulin, despite experiencing high glucose levels, merely repeated the word "safe" when asked to articulate a living plan post-release, and continued to experience significant incontinence even with increased care. This evidence does not support a conclusion that D.L. could address her health, safety, and hygiene needs without assistance. More critically, the focus of substantial evidence review is not whether the facts in the record could support other findings, but only whether the findings made by the trial court were properly supported by that evidence. Sunnyside Valley Irr. Dist. v. Dickie, 149 Wn.2d 873, 879-880, 73 P.3d 369 (2003) ("a reviewing court will not substitute its judgment for that of the trial court even though it might have resolved a factual dispute differently.").

The trial court also properly found that a less restrictive alternative was not appropriate for D.L., reasoning that D.L.'s symptoms and conditions persisted even while under more intensive supervision and care. See RCW 71.05.240(4).

Affirmed.

8

WE CONCUR: