
# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 73257-9-I |
| | ) | |
| ANDREW J. AIKEN, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TINA M. AIKEN, | ) | PUBLISHED OPINION |
| | ) | |
| Respondent. | ) | FILED: May 23, 2016 |
| | ) | |

VERELLEN, C.J. — If a parent borrows money from his or her employer to purchase stock under an employee stock incentive plan, any income from such stock is included for purposes of computing child support. The principal and interest expenses paid by the parent on that loan may qualify for the "normal business expenses" deduction allowed under RCW 26.19.071(5)(h). If the purchase of stock is in the nature of an investment, the costs associated with that investment are not deductible. If the purchase is a form of compensation for employment, the payments necessary to protect that aspect of compensation are deductible.

On this record, there is no showing that Andrew Aiken's stock incentive plan purchases are in the nature of compensation rather than an investment. The stock purchases were voluntary acquisitions of an income-producing asset. While his income

is lower without the asset, the purchases were not a requirement for his employment as chief financial officer (CFO) nor a portion of his compensation as CFO.

Other issues raised by Andrew regarding extraordinary expenses and respite care are not persuasive, except the absence of findings regarding the necessity for and reasonableness of their son's extraordinary expenses. Therefore, we remand for the entry of findings regarding the necessity for and reasonableness of extraordinary expenses. We affirm as to all other rulings.

## FACTS

The superior court dissolved Tina and Andrew Aiken's marriage in 2010.[1] The parties have two daughters and a son. Their son, J.A., has Down syndrome and autism. The parenting plan designated Tina as the primary residential parent of the children, then ages 10, 8, and 6. The plan provided that the parties had joint decision-making authority regarding the children's education and nonemergency health care and that any disputes "other than child support disputes" were subject to mediation.[2]

Tina quit her job as an attorney when J.A. was born in 2004, and she stayed home to care for the children. Andrew is the CFO of Sellen Construction, a position he has held since joining the company in 2005. Under the original child support order, Andrew agreed to pay $3,000 in monthly child support. The parties agreed to equally share the cost of the children's extraordinary expenses listed under paragraph 3.15 in the support order.[3] Those expenses included day care, "agreed" educational expenses,

---

[1] For clarity, we refer to the Aikens by their first names.

[2] Clerk's Papers (CP) at 1327.

[3] CP at 49-50. We use the term "extraordinary expenses" to indicate expenses not included in the transfer payment.

"agreed" extracurricular activities, "including, but not limited to piano lessons; soccer, basketball and other sports registration fees and other fees associated with those activities; sports uniforms and equipment; swimming lessons."[4] The child support order reserved the right to petition for postsecondary education support.[5]

J.A.'s dual diagnosis of Down syndrome and autism is profound. His "impulsivity and lack of any self-safety skills make it necessary for him to be closely supervised at all times."[6] In addition to constant supervision, J.A. also needs constant stimulation and directed activities. Although continued education and therapy may improve his functioning, "he will never be able to live independently and will require closely supervised care for the rest of his life."[7]

J.A.'s impulsivity and inability to recognize dangerous situations "is becoming more problematic as he gains size and physical strength."[8] His physician recommends that he receive applied behavior analysis therapy on a daily basis and speech therapy on a weekly basis. Accordingly, J.A.'s special needs result in higher than usual medical expenses. J.A.'s physician also suggests that adding more physical activities back into his schedule, such as skiing and swimming, "would likely help reduce his behavior concerns."[9]

---

[4] CP at 50.
[5] CP at 49.
[6] CP at 254.
[7] CP at 256.
[8] CP at 256.
[9] CP at 255.

Tina's ability to provide J.A. sufficient supervision and stimulation changed when she reentered the workforce. Since 2014, Tina has been employed full time as an attorney. She regularly works weekends and evenings and often has to arrange care for J.A. during those times. As the primary parent providing 70 percent of J.A.'s residential care, Tina has also found it difficult to find time to focus on her daughters or take care of her personal needs.

In light of these changes, Tina moved to modify the child support order in October 2014. She sought, among other things, to adjust monthly child support based on the parties' current incomes, to provide post-secondary support for the two daughters, to require the parties to pay for respite care and the children's extracurricular and educational expenses based on their proportional share of income, and to define "more specifically" what those expenses should be, along with a process for resolving any disputes about those expenses.

Andrew agreed that postsecondary support should be established for their daughters and that the trial court should readjust child support based on their current incomes. However, he argued that, for purposes of calculating child support, the trial court should deduct the payments he makes on his loans from Sellen to purchase 2.2 percent of common stock in the company as normal business expenses under RCW 26.19.071(5)(h).

Andrew acquired the stock by participating in Sellen's employee stock incentive plan. As Andrew acknowledges, the "stock purchases were neither mandatory nor a requirement" of him keeping his job.[10] Andrew first purchased the stock in 2006, and

---

[10] CP at 108.

4

made additional purchases in 2008 and 2010. He continued purchasing stock every other year after the parties' dissolution in 2010.

To purchase stock, Andrew borrowed money from Sellen and executed promissory notes payable to Sellen. If Andrew fails to make payments due on the notes, Sellen "shall have the exclusive right and option" to redeem his shares under the stockholders' agreement.[11] The cash distributions Andrew received from his ownership interest in 2012, 2013, and 2014 were $107,621, $74,209, and $125,324, respectively. These distributions were in addition to his gross annual base salary and bonus. During those same years, Andrew paid $84,104, $83,643, and $111,671, respectively, towards the principal and interest on his notes.

A superior court commissioner declined to deduct Andrew's loan payments for purposes of determining his child support obligation. Andrew moved to revise. Tina also moved to revise the order, challenging the commissioner's decision denying respite care and the commissioner's failure to address her request for a more specific list of the children's extracurricular and educational expenses.

A superior court judge agreed with the commissioner's ruling that Andrew's loan payments were "debt voluntarily incurred."[12] The court found that Andrew's gross monthly salary and bonus was $19,359.75, that his gross monthly distribution from the Sellen stock was $10,443.67, and concluded that his monthly net income was $21,903.66. The court determined that Tina's monthly net income was $9,237. Based

---

[11] CP at 1188.

[12] CP at 240.

on those current income figures, the court reduced Andrew's monthly child support payment to the standard calculation, $2,366.

The trial court ordered the parties to proportionately share the children's extraordinary activities expenses, with Andrew to pay 70.34 percent and Tina to pay 29.66 percent. The court affirmed the daughters' extraordinary activities listed under paragraph 3.15 in the child support order: work-related day care, agreed educational expenses, and agreed extracurricular activity expenses. However, the court granted Tina's motion in part by revising the description of J.A.'s extraordinary activities under paragraph 3.15 to include:

> Educational expenses including school field trips, tutoring, and other educational support recommended by [J.A.]'s school or health care providers.
>
> Activities as recommended by [J.A.]'s health care providers including but not limited to skiing and swim lessons, pool passes, and Easter Seal Camps (4 weekend camps and one 7-day camp each year). Expenses for skiing include lessons, equipment, and ski pass.
>
> Up to 14 hours per calendar month of respite care in the mother's household during her non-working hours, and up to 6 hours per calendar month of respite care in the father's household during his non-working hours, not to exceed $25 per hour.[13]

The trial court also ordered the parties to arbitrate any dispute whether the expenses should be shared for any given extraordinary activity for any of the children.

Andrew appeals.

---

[13] CP at 247-48.

ANALYSIS

We review a trial court's decision to modify an order of child support for manifest abuse of discretion.[14] To prevail on appeal, Andrew must show that the trial court's decision was manifestly unreasonable, or was based on untenable grounds or untenable reasons.[15]

> A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard.[16]

The interpretation of a statute is a question of law reviewed de novo.[17]

*Andrew's Loan Payments*

The primary issue in this appeal is whether the superior court erred when it failed to apply the normal business expenses deduction allowed under RCW 26.19.071(5)(h) even though Andrew is obligated to make principal and interest payments on loans he borrowed from his employer.

RCW 26.19.071(5)(h) provides that "[n]ormal business expenses and self-employment taxes for self-employed persons" shall be "deducted from gross monthly income to calculate net monthly income." "Normal business expenses" are not defined in the statute or court rules.

---

[14] In re Marriage of Booth and Griffin, 114 Wn.2d 772, 776, 791 P.2d 519 (1990); Schumacher v. Watson, 100 Wn. App. 208, 211, 997 P.2d 399 (2000).

[15] In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

[16] Id. at 47.

[17] In re Parentage of J.M.K., 155 Wn.2d 374, 386, 119 P.3d 840 (2005).

Our objective in construing a statute is to ascertain and give effect to legislative intent.[18] "We look first to the text of the statute to determine its meaning."[19] When the meaning of statutory language is plain on its face, "we must give effect to that plain meaning as an expression of legislative intent."[20] If the statute is unambiguous after a review of the plain meaning, our inquiry is at an end.[21]

We apply the plain meaning of "normal business expenses." In re Marriage of Mull provides guidance.[22]

In Mull, the father was offered a partnership position in a law firm. As a partner, the father earned double his income as an associate but was required to make payments to the partnership "as part of the 'requirements and commitments' of his partnership position."[23] On appeal, the mother argued the trial court should not have allowed the father to deduct his "contributions to the Perkins Coie building partnership, his partnership 'buy-in,' and his contribution to the law firm" as normal business expenses for purposes of calculating his child support obligation.[24] This court disagreed, holding that "when a parent is required to make capital contributions in order to maintain his or her source of income and when such contributions are not made to

---

[18] Lake v. Woodcreek Homeowners Ass'n, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010).

[19] Griffin v. Thurston County Bd. of Health, 165 Wn.2d 50, 55, 196 P.3d 141 (2008).

[20] Wash. Pub. Ports Ass'n v. Dep't of Revenue, 148 Wn.2d 637, 645, 62 P.3d 462 (2003).

[21] Lake, 169 Wn.2d at 526.

[22] 61 Wn. App. 715, 812 P.2d 125 (1991).

[23] Id. at 721.

[24] Id.

evade greater child support obligations, those contributions qualify as 'normal business expenses.'"[25] Without the contributions, the father would not have been a partner and would not have received his increased compensation.

Andrew, on the other hand, was not required to purchase Sellen stock to remain CFO of the company. The stock purchases were entirely voluntary. Moreover, the receipt of distributions on the stock is not the equivalent of the "income" at stake in Mull. In Mull, the partnership distributions are clearly compensation. Here, the stock incentive plan expressly states that its "purpose" "is to retain and motivate employees, officers and directors of the Company by providing them the opportunity to purchase shares of the Company's common stock . . . and acquire a proprietary interest in the Company."[26] Holding a proprietary interest is not necessarily a form of compensation.[27]

As typical in closely-held businesses, the stockholder agreement places restrictions upon the transfer or gifting of the stock to third parties and upon transfers at the death or divorce of the stockholder employee. Moreover, if the stockholder retires at age 60 or later, the stockholder agreement requires the company to redeem 20 percent of the stockholder's shares at book value on the date of retirement.[28] But there is no showing that any of these provisions operate to enhance the stock purchases as an

---

[25] Id. at 722 (emphasis added).

[26] CP at 1176.

[27] Other potentially significant factual details are not addressed in the record before us. For instance, we do not know if the plan is described to new employees as part of their compensation package or as part of potential compensation they may qualify for in the future. Likewise, we do not know how the plan is described to employees who are offered the opportunity to purchase stock. We also do not know whether employees are expected to purchase stock when offered the opportunity to do so.

[28] CP at 894.

9

aspect of compensation rather than an opportunity to benefit from potential appreciation.

On this record, there is no showing that Andrew's stock purchases are a portion of his compensation as CFO rather than an investment in his employer. Had Andrew borrowed funds to purchase stock in a publicly-traded company or to purchase rental property that would generate income and potentially appreciate in value, our analysis would be the same. Income from either of those investments would still be considered for purposes of his child support obligation, but his cost in acquiring either investment would not be deducted from his gross monthly income.

The premise of Andrew's underlying argument is that it is inequitable to consider income without accounting for the costs of generating that income. But this premise is not recognized in the child support statute; the statute does not offset the "costs" of acquiring any income-producing asset against the income generated by that asset.

Further, any suggestion that Andrew's stock purchases function as a retirement vehicle is not established in this record. The stock incentive plan and stockholders' agreement provisions for redeeming shares under the plan upon retirement do not establish that the stock purchases are the equivalent of a pension plan.[29]

There are a wide variety of plans that allow employees to obtain ownership in their employer, and many of those plans are structured to motivate employees.[30] Such

---

[29] RCW 26.19.071(5)(g) permits parties to deduct from their gross income a maximum of $5,000 in voluntary retirement contributions.

[30] The varied purposes of employee ownership plans include reducing worker alienation and enhancing job satisfaction, increasing employment security and worker income and wealth, increasing productivity, providing employees an additional fringe benefit, reducing "information asymmetries" between management and employees, reducing agency costs, increasing incentive for employee self- and mutual monitoring,

a plan is not necessarily a form of additional compensation that triggers the normal business expenses deduction.

Finally, Andrew's argument that his note payments became mandatory once he incurred the debt is not compelling. The same would be true for any loan incurred to acquire an income-producing asset. Here, the stock purchases were voluntary acquisitions of an income-producing asset. Unlike Mull, Andrew was not required to purchase shares under the stock incentive plan in order to maintain his compensation as CFO.

Therefore, the trial court properly concluded that Andrew's loan payments do not qualify as normal business expenses.

*Special Child-Rearing Expenses under RCW 26.19.080*

Andrew contends the revised requirement that the parties proportionately share the expense of J.A.'s extraordinary activities improperly modified or undercut the parties' joint decision-making authority under the parenting plan.

Under RCW 26.19.080(4), the "court may exercise its discretion to determine the necessity for and the reasonableness of all amounts ordered in excess of the basic child support obligation." To exceed the basic child support obligation, the trial court must determine that additional amounts are reasonable and necessary, considering, among

---

reducing worker "lock-in." See, e.g., Aditi Bagchi, *Varieties of Employee Ownership: Some Unintended Consequences of Corporate Law and Labor Law*, 10 U. Pa. J. Bus. & Emp. L. 305, 310 (2008); Jeffrey M. Hirsch, *Labor Law Obstacles to the Collective Negotiation and Implementation of Employee Stock Ownership Plans: A Response to Henry Hansmann and Other "Survivalists,"* 67 Fordham L. Rev. 957, 967 (1998); Henry Hansmann, *When Does Worker Ownership Work? ESOPs, Law Firms, Codetermination, and Economic Democracy,* 99 Yale L.J. 1749, 1761 (1990).

other things, "the special medical, educational and financial needs of the children."[31] The court must also determine whether the additional amounts are commensurate with the parties' income, resources, and standard of living.[32] This inquiry guides the trial court's broad discretion.[33]

Here, the parties have never had a pure joint decision-making arrangement. While the original parenting plan provided for joint decision-making authority for the children's education and nonemergency health care, paragraph 3.15 in the original child support order provided for shared payment of "agreed" extracurricular activities, including, but not limited to, piano lessons, swimming lessons, and soccer, basketball, and "other sports" fees.[34] The revised child support order does not undercut the parties' joint decision-making authority under the parenting plan any more than the list of activities in paragraph 3.15 of the original child support order did. For example, adding skiing to a list of sports is not a meaningful change to the already qualified joint decision-making provision in the parenting plan.

Additionally, the court has discretion to take into account the impact of J.A.'s profound limitations.[35] Here, the deferral to recommendations of J.A.'s education and healthcare providers has to be read in light of the qualification in revised paragraph 3.15 that "[f]or all children," failure to reach agreement whether expenses should be shared

---

[31] In re Marriage of Daubert, 124 Wn. App. 483, 495-96, 99 P.3d 401 (2004).

[32] Id. at 496.

[33] Id. at 490.

[34] CP at 49-50.

[35] Daubert, 124 Wn. App. at 495-96.

12

"for any given activity . . . under this paragraph" is subject to binding arbitration.[36] The original parenting plan required mediation of disputes regarding extraordinary activities.[37] But it was within the discretion of the trial court to shift to arbitration as a more practical approach for disputes over extraordinary activities. Especially to accommodate the special needs of J.A., such a dispute resolution refinement was within the discretion of the trial court.

While there is broad discretion, the trial court is required to make adequate findings regarding the necessity for and reasonableness of the extraordinary expenses.[38] In doing so, the court is not required to make an itemized list of each and every particular activity and its specific cost; the court can make findings based upon categories. Here, although the record includes historic costs for these activities, and projections based on historical costs may be adequate where there is evidence of the future necessity of such expenses, the trial court did not include any of these costs or any projections in its orders or child support worksheet as a basis for these expenses.[39] Therefore, we must remand for such findings as to J.A.'s revised extracurricular and educational expenses.

---

[36] CP at 248.

[37] We do not read the limitation "other than child support disputes" as extending to disputes whether to agree on extraordinary activities. If an extraordinary activity is agreed, paragraph 3.15 of the child support order requires the parties to share that expense.

[38] Daubert, 124 Wn. App. at 495.

[39] See CP at 69-70; see also Daubert, 124 Wn. App. at 497-98 (explaining that past events alone, without evidence of the future necessity of those expenses, cannot provide a basis for future support).

*Respite Care*

Andrew contends the trial court erred in ordering the parties to share the expense of respite care because "[r]espite care is intended to support the parent, not the child."[40] We disagree.

Here, the trial court expressly found "that respite care for the parents is directly related to support of [J.A.] in light of [his] significant impairments."[41] In this setting, the respite care benefits not just the parents but also helps protect J.A. from harm and benefits the two daughters. Therefore, we conclude there is substantial evidence to support the trial court's finding.

*Attorney Fees and Costs*

Tina requests attorney fees on appeal under RCW 26.09.140. Andrew opposes the request, arguing that Tina does not have the need for her attorney fees to be paid.

Under RCW 26.09.140, we have discretion to order a party to pay the other party's attorney fees associated with the appeal of a dissolution action. "In exercising our discretion, we consider the arguable merit of the issues on appeal and the parties' financial resources."[42]

Tina provided a declaration of financial need as required by RAP 18.1(c). Andrew filed a timely objection to her declaration. Thereafter, Tina filed a reply to Andrew's objection, and Andrew moved to strike her reply. But even considering Tina's reply, we conclude Tina is financially able to pay her attorney fees and that it would not be an undue hardship to do so. Therefore, we deny her request for fees on appeal.

---

[40] Appellant's Br. at 2.

[41] CP at 241.

[42] In re Marriage of C.M.C., 87 Wn. App. 84, 89, 940 P.2d 669 (1997).

No. 73257-9-I/15

We affirm in part and remand for entry of findings regarding the necessity for and reasonableness of J.A.'s extracurricular and extraordinary expenses as recommended by his school and healthcare providers.

WE CONCUR:

15