IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of: | ) | No. 38279-6-III |
| | ) | |
| ANGELICA BRADLEY, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | UNPUBLISHED OPINION |
| and | ) | |
| | ) | |
| MICHAEL BRADLEY, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Michael Bradley appeals the trial court's maintenance

award. He argues the court misread three large transactions in his bank statements and

assumed he had stolen a large amount of money from community property. While we

agree the trial court misread the three large transactions, substantial evidence still

supports the trial court's finding that Mr. Bradley had sufficient undisclosed income to

pay the maintenance award. Although we affirm the trial court's maintenance award, we

deny Ms. Bradley's request for attorney fees on appeal.

FACTS

Angelica and Michael Bradley were married on May 15, 2018; they separated on March 6, 2020. They had no children. A trial was held to determine the division of debts and assets, requests for spousal support, an equalization payment, and attorney fees.

### *Ms. Bradley's home and car*

Ms. Bradley worked as a language specialist for Spokane School District 81. She had been married previously. In her prior divorce, her husband had agreed to pay her mortgage until she remarried. He also agreed to pay her car loan.

When Mr. and Ms. Bradley married in 2018, she owned her car outright. At Mr. Bradley's urging, Ms. Bradley bought a new car, taking out a loan to buy it. At the time of trial, the balance of the loan was $15,415.71.

Mr. and Ms. Bradley refinanced Ms. Bradley's home when they married and took over mortgage payments from Ms. Bradley's former husband. At the time of trial, the mortgage balance was $228,662.11. They also took out a $45,000.00 home equity line of credit (HELOC) on the home, which Mr. Bradley used at least in part to build an addition to the house for his home office. At the time of trial, the balance on the HELOC was $44,999.00.

*Mr. Bradley's businesses*

When the parties married, Mr. Bradley owned, in whole or in part, a number of companies: Beacon Builders, Zeus-Batcave II, Six Minutes, LLC, Spokane Construction Rentals Company, and Scout Property Management. During the marriage, Mr. Bradley formed the company Flawless Walls with two partners. He formed Big Pine Development with partners on April 8, 2020, one month after Ms. Bradley filed for divorce.

The companies were all related. Beacon Builders was a general contractor. Zeus-Batcave II was a real estate holding company; Beacon Builders leased its building from Zeus-Batcave II. Mr. Bradley formed Scout Property Management with his business partners with the intention of managing apartment buildings; they closed the business after one year. Mr. Bradley formed Six Minutes with a partner with the intention of patenting a better wall construction method. Mr. Bradley formed Spokane Construction Rentals with the intention of using the company to buy tools and rent them to his other companies. Flawless Walls manufactured wall assemblies for contractors including Beacon Builders. Big Pine Development was registered as a construction company, but at the time of trial it was not making or spending money.

Ms. Bradley was not involved in Mr. Bradley's businesses. While he deposited his paycheck from Beacon Builders into their joint bank account, he did not deposit other income from the companies into that account. He had $50,000 in Internal Revenue Service tax debt from 2018 relating to his businesses; that debt was incurred before the marriage.

*Trial*

Ms. Bradley argued she should be put back in the position she was before the marriage: a paid-off car, no mortgage payments, substantial equity in her home, and no HELOC. She requested Mr. Bradley pay her mortgage, car loan, HELOC, attorney fees, and spousal maintenance.

Mr. Bradley testified the Beacon Builders' bank account had been seized by the Department of Labor and Industries for unpaid taxes and the company was not allowed to have employees. He stated he was at that time an employee of Flawless Walls and his take-home pay was between $800 and $900 per week. Mr. Bradley did not own a vehicle, but drove a truck owned by Flawless Walls. He testified he was good at construction but bad at business, and that he let his business partners handle all the businesses, including starting Big Pine Development without Mr. Bradley's knowledge. He testified that Beacon Builders was hundreds of thousands of dollars in debt and that he had two to

three hundred thousand dollars of negative equity in Flawless Walls.  He introduced

Exhibit R-101, consisting of bank statements for Beacon Builders, Flawless Walls, and

his own personal bank account, "for [the] purpose of demonstrating that there's a

difference between gross receipts and net profit."  Report of Proceedings (RP) at 131.

There had been a breach of contract action against Beacon Builders in which the

plaintiffs sued the owners and their spouses in their individual capacities.  As a result,

judgment was entered against Mr. and Ms. Bradley for $132,000.  Mr. Bradley stated he

planned to declare bankruptcy to stave off future lawsuits from his business dealings.  Mr.

Bradley argued Ms. Bradley should be responsible for paying the judgment from the

lawsuits because she "didn't get off the boat" when she knew it was sinking.  RP at 86.

Mr. Bradley proposed they sell the house, pay off the judgment from the lawsuit,

and split the remaining $120,000.  He argued Ms. Bradley would "walk[ ] away with no

lawsuit, no debt, no bankruptcy, no problems, and $60,000 in her pocket to make a down

payment on a house."  RP at 89.  He argued the HELOC should be paid off with the

proceeds from the house sale.

Mr. Bradley called Todd Carlson to testify on the value of Mr. Bradley's

businesses.  Mr. Carlson prepared a report valuing all the businesses.  He testified that

because the businesses carried debt, the businesses did not have significant value except

Zeus-Batcave II because of the real estate it owned. He testified that Zeus-Batcave II had a net worth of $210,917, and Mr. Bradley's ownership interest was worth $52,729. Mr. Carlson's report valued Beacon Builders at negative $502,000 and the remaining businesses at zero dollars.

Mr. Carlson also testified that owners of small business almost always pay their owners a salary below market value for income tax reasons. Owners then typically pay themselves through distributions from the company, which are not subject to Social Security and Medicare taxes. He testified that between salary and shareholder distributions from Beacon Builders, Mr. Bradley had been paid between $85,000 to $90,000 in 2017 and 2018, but that in 2019, he did not receive any salary and drew out $38,667 as a distribution.

### *Court's ruling*

At the outset of its ruling, the trial court noted it had taken time after the parties presented their evidence to review all of the evidence. It found that Ms. Bradley's house and car were community property, the house had a value of $412,000, and the car had a value of $14,825. It also found that the only other property owned by the parties was the real estate owned by Zeus-Batcave II, with a value of $52,729. It further found that Mr. Bradley's companies had no value and awarded them to him, including all their debt.

The court acknowledged Ms. Bradley's desire to return to the same financial position she was in before the marriage, but noted that she had made the choice to forgo lifetime mortgage payments and remarry. The court concluded that requiring Mr. Bradley to pay off the mortgage was not equitable in light of the parties' financial circumstances. It awarded Ms. Bradley the house and its existing equity. It found that the majority of Ms. Bradley's retirement benefits were separate property and awarded them to her.

The court discussed the factors in RCW 26.09.090 regarding spousal maintenance. It considered the parties' financial needs, excluding some of each party's self-reported expenses. At length, the court expressed concern about Mr. Bradley's self-reported income:

> And, again, I go back to the argument of Ms. Bradley, the allegations that Mr. Bradley had significant income that's not disclosed or somehow has not been forthcoming with his earnings. And I'll tell you that when I go through, again, R-101, I had some very, very big concerns about Mr. Bradley and his veracity.
> I'm going to start with just briefly indicating that when I go through the bank statements from State Bank that exist under the first section of R-101, I will note that these bank statements do not have any canceled checks, I just have bank statements. And the bank statements show me that there are various things that come out regularly with no explanation. And today isn't the time for explanation. Explanation should have been during trial.

RP at 236-37.

7

The court noted several recurring payments it did not have information about. It also noted there were regular payments toward a Visa card and that it had no way to verify if the card was being used for business expenses. It noted there were significant amounts of money that appeared to be going toward paying back various lines of credit, but there were also a large number of checks for which it did not have canceled checks. It noted, "[W]ithout canceled checks, huge concern and huge questions for the Court." RP at 237.

The court acknowledged that Mr. Carlson's business valuations had looked at the money coming in and going out of the business accounts, but noted "where the money is going is not a question that's been answered. And these are huge concerns for the Court. . . . The statements . . . have lots of unanswered questions about monies in and out that the Court cannot determine if they were business expenses, if they were transferred between businesses." RP at 238. The court further noted it had a "huge concern" about a large transaction from the Beacon Builders account:

> [O]n February 25th there was a transfer of $168,434. It doesn't say where, a number that doesn't match up to any of the other accounts. I couldn't find that matching up to any of the other business accounts or private account of Mr. Bradley. So I'm not sure where that was going.

RP at 238.

The court identified a similar problem with checks to unknown payees from the Flawless Walls bank account, but added it also had a "big concern" about the "highly suspicious"[1] deposits into the account:

> Looking at the Flawless Walls Columbia Bank statement for the month of March 2020, there was a beginning balance of $11,075 and some change, ending balance of $30,050 and some change. There were two deposits that month, two deposits of round numbers, $75,000 even on March 4th and $8,000 even on March 24th. That pattern continued almost every month with round number deposits into this account. . . .
> And this is a business that's working. It's actually, testimony was, it's conducting business. So if you're conducting business, it would be reasonable to assume that there should be several deposits reflecting work that was done or at least somehow delineating some sort of a deposit that wouldn't be continually a round number. . . . Again, the Court's concerned about I don't know where the rest of the funds are going because multiple, multiple checks have been written without any delineation.
> . . . Again, just too many questions that are suspicious without answers.

RP at 238-40. The court further identified two large transactions in the Flawless Walls statements it found suspicious:

> [T]here was a transfer, a wire transfer just a couple months before trial on February 12th, 2021, wire transfer to Paul J. Cassell in the amount of $100,000. And there was a wire transfer on March 8th from that same account to Paul J. Cassell in the amount of $100,000. So in two months' time Mr. Bradley transferred $200,000 from this account to one of his business partners. So very, very suspicious.

RP at 240.

---

[1] RP at 238.

The court concluded:

> I will tell you, while that leaves me with lots of questions, it does not tell me what Mr. Bradley's monthly income is when I'm determining maintenance. I can tell you based on what I've read and what appears to me to be happening without having anyone give me a forensic review of this, I do suspect, Mr. Bradley, that you are playing fast and loose with either your books or your accounting. And it would have been incumbent upon you to give the Court that information. But simply handing it to me, I have more questions now I think than when we started our trial.

RP at 240.

The court found it would be just and equitable to ensure Ms. Bradley was able keep her house and her car, assets she came into the marriage with. It ordered Ms. Bradley to pay the mortgage. The court noted Mr. Bradley's expressed intent to file for bankruptcy and that bankruptcy could put Ms. Bradley's assets in jeopardy. It thus ordered Ms. Bradley to pay the HELOC and her car payment, but ordered Mr. Bradley to pay Ms. Bradley maintenance of $1,700 per month for 36 months to cover those payments without endangering the assets in his bankruptcy proceedings. The court ordered Ms. Bradley to pay $21,000 of her own attorney fees, finding it was just and equitable in light of the fact she would be keeping her home and receiving maintenance.

Mr. Bradley timely appealed the court's maintenance award.

10

ANALYSIS

MAINTENANCE AWARD

Mr. Bradley contends the trial court misread bank statements, assumed he had stolen money from the community and therefore erred in awarding maintenance. He convincingly shows that some reasons given by the trial court for believing he had undisclosed income are not supported by the record. Nevertheless, we affirm because substantial evidence still supports the trial court's finding that Mr. Bradley had undisclosed income sufficient to pay the ordered maintenance.

We review a trial court's decision to grant or deny maintenance for an abuse of discretion. *In re Marriage of Zahm*, 138 Wn.2d 213, 226-27, 978 P.2d 498 (1999). "'A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.'" *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005) (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997)).

Mr. Bradley argues the record does not support the trial court's finding that he stole $368,434.38 from the marital community. This is not what the trial court found to support its maintenance award. Rather, the trial court found that Mr. Bradley had sufficient undisclosed income to pay the ordered maintenance.

11

We review a trial court's challenged findings of fact for substantial evidence. *Sunnyside Valley Irrig. Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). "Substantial evidence" is "defined as a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." *Id.* "We will not 'disturb findings of fact supported by substantial evidence even if there is conflicting evidence.'" *McCleary v. State*, 173 Wn.2d 477, 514, 269 P.3d 227 (2012) (quoting *Merriman v. Cokeley*, 168 Wn.2d 627, 631, 230 P.3d 162 (2010) (per curiam).

Mr. Bradley is correct; the trial court misread two deposits of $100,000.00 as withdrawals and failed to find a deposit in one account that corresponded to the $168,434.38 withdrawal noted by the court in its oral ruling. *See* Trial Ex. R-101, Columbia Bank Account No. XXXXXX2856 Statements (Feb. 28, 2021) at 1 & (Mar. 31, 2021) at 2; State Bank Northwest Account No. 7014566 Statement (Feb. 26, 2021) at 1; State Bank Northwest Account No. 7015878 Statement (Feb. 26, 2021) at 3.

Nevertheless, the conflicting evidence still supports the trial court's finding that Mr. Bradley had undisclosed income sufficient to pay the ordered maintenance. The court highlighted various transactions to support its related finding that Mr. Bradley was "playing fast and loose with either [his] books or [his] accounting." RP at 240. The three transactions Mr. Bradley points to were just a few of the many transactions the court

12

found concerning.  And while the three transactions, now shown to be innocuous, were for large dollar amounts, Mr. Bradley's businesses routinely had hundreds of thousands of dollars moving in and out of their accounts every month.

Mr. Bradley introduced the bank statements to show that his businesses had more expenses than income and were losing money.  The court acknowledged that Mr. Bradley's businesses had negative value, but found there was insufficient information on where the money was going.  This is supported by the record.

The court noted that Beacon Builders paid many high-value checks for which Mr. Bradley had provided no information about the payees.  It highlighted January 2020, "On January 7th there was a $43,267 check made payable to I don't know who.  On January 8th, a $17,731 check made payable to I don't know who.  January 14, $34,076.  January 14 again, $39,872.  And several more just that month of over $10,000 apiece.  Highly concerning."  RP at 237.

The record supports the trial court's concerns.  In January 2020, there were 10 checks for amounts greater than $10,000.00 cashed from the Beacon Builders account.  The 10 checks total $297,075.90 in outgoing funds with no known payee, more than one-half of the total withdrawals of $551,356.92 for the month.  *See* Trial Ex. R-101, State Bank Northwest Account No. 7010820 Statement (Jan. 2020) at 6-7.  Further, there are a

No. 38279-6-III
*In re Marriage of Bradley*

number of checks that month for smaller amounts that total more than $58,000.00, again

with no known payee. *Id.* This pattern of spending continued in the Beacon Builders

account throughout 2020:

|  | Total paid checks | Total withdrawals |
|---|---|---|
| January 2020 | $355,525.73 | $551,356.92 |
| February 2020 | $327,439.20 | $576,883.35 |
| March 2020 | $117,655.32 | $279,163.94 |
| April 2020 | $80,676.20 | $174,271.85 |
| May 2020 | $173,913.05 | $251,746.03 |
| June 2020 | $150,621.62 | $261,885.61 |
| July 2020 | $45,893.51 | $234,126.29 |
| August 2020 | $151,853.80 | $297,123.71 |
| November 2020[2] | $54,954.49 | $147,228.17 |
| December 2020 | $1,000.00 | $67,081.22 |
| Total | $1,459,532.92 | $2,840,867.09 |

[2] The September statement is incomplete but shows withdrawals totaling $424,337.71.  The October statement is absent from the record.

14

*See* Trial Ex. R-101, State Bank Northwest Account No. 7010820 Statements (Jan. 31, 2020 to Sept. 30, 2020); Account No. 7015878 Statements (Nov. 30, 2020 to Dec. 31, 2020).  As illustrated in the above table, more than one-half of Beacon Builders' withdrawals in 2020 were made by check to unknown payees.  As the court noted, while the bank statements may show the business was operating at a loss, they do not show that Mr. Bradley himself was losing money.  Without information about the check payees, the court had no way to tell if they were going toward business expenses or toward the owners' pockets.

The court also expressed concern that Beacon Builders' account showed regular payments toward credit cards for which the court had no records, "There every month are regular payments on a Visa card that I could not verify in any of the documents.  I do not [know] if that's a Visa card for the business.  The information I got about the business, while it was not terribly thorough, didn't include any Visa cards."  RP at 237.

Again, the record bears this concern out.  From January to November 2020, Beacon Builders' bank statements show there were at least 56 payments totaling $62,576.47 to five different Visa accounts.[3]  *See* Trial Ex. R-101, State Bank Northwest

---

[3] The April statement is incomplete and omits any withdrawals between April 13 and April 29, 2020.  The September statement is incomplete and does not include any withdrawal details.  The October statement is absent from the record.

Account No. 7010820 Statements (Jan. 31, 2020 to Sept. 30, 2020); Account No.

7015878 Statement (Nov. 30, 2020). In some months, the Visa payments totaled more

than $10,000. *See* Trial Ex. R-101, State Bank Northwest Account No. 7010820

Statement (Mar. 31, 2020); Account No. 7015878 Statement (Nov. 30, 2020). There

were no statements for these Visa cards. Again, the trial court had no information about

whether the Visa cards were being used for business or personal expenses.

The court also questioned the fact that Flawless Walls' income almost exclusively

came in the form of transfers of even-dollar amounts of money, which appeared to be

inconsistent with Mr. Bradley's testimony that the company was being paid for work

performed:

> And then on the Flawless Walls bank account, . . . the deposits were
> highly suspicious.
> . . . .
> . . . [I]f you're conducting business, it would be reasonable to
> assume that there should be several deposits reflecting work that was done
> or at least somehow delineating some sort of a deposit that wouldn't be
> continually a round number.

RP at 238-39.

Again, the record supports the court's concern. In Flawless Walls' bank

statements from January 2020 to January 2021, there were 34 deposits totaling $492,100,

all in even hundred-dollar or even thousand-dollar amounts. *See* Trial Ex. R-101,

Columbia Bank Account No. XXXXXX2856 Statement (Jan. 31, 2020 to Jan. 31, 2021).

Meanwhile, Flawless Walls had outgoing payments and withdrawals that *were* consistent

with an operating business. There were frequent transactions with hardware stores,

lumber yards, and gas stations. It had recurring payroll transfers beginning in May 2020.

A logical inference is that Mr. Bradley and his co-owners were comingling funds across

businesses; from this, one might reasonably conclude they were doing this to obfuscate

payments to themselves to hide their income.

Mr. Bradley argues that the expenses were legitimate business expenses that he

could explain given time with his bookkeeper and accountant, and that he could not have

predicted the court would need explanations of every transaction. This is unavailing. As

the court noted, the time for explanation was at trial. Mr. Bradley chose to proceed to

trial with incomplete information. He provided the court with bank statements that

showed more than one-half of Beacon Builders' expenditures went to unknown payees.

He could have provided cancelled checks and credit card statements to supplement the

bank statements. He could have provided bookkeeping records about the businesses'

accounts payable and accounts receivable. He could have singled out some of the largest

transactions or the recurring transactions and explained them. Instead, as the trial court

17

observed, Mr. Bradley "simply hand[ed]" the court a stack of bank statements that create more questions than answers. RP at 240.

Further, after finding Mr. Bradley was not truthful about his income, the court did not abuse its discretion in ordering maintenance. It noted the RCW 26.09.090 factors and focused on Ms. Bradley's financial need for maintenance and Mr. Bradley's financial ability to pay, finding that the just result was to make sure Ms. Bradley was able to stay in her home and keep her car. It considered Ms. Bradley's ability to pay her mortgage, the HELOC, and the car payment in light of her income and found it was not feasible. It found Mr. Bradley had the ability to pay for the HELOC and car payment and meet his own financial needs. It ordered maintenance to equalize the parties' positions and put them in the same position as they were during the marriage. This was not error.

For the first time in his reply brief, Mr. Bradley raises the issue of the appraisal of a piece of property owned by Zeus-Batcave II. While new arguments may not be raised in reply, *see Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992), we address this argument to the extent it concerns the broader issue of whether the record supports the trial court's credibility findings.

At trial, Ms. Bradley argued that a real estate excise tax affidavit showed a piece of property partly owned by Mr. Bradley was valued at $2,109,870. Mr. Bradley disagreed

18

about the valuation at trial and claims on appeal that the affidavit was forged. Mr.

Bradley's expert valued the property at $210,917, making Mr. Bradley's share of the

property $52,729. The court accepted Mr. Bradley's calculation, valuing the property at

$52,729. This issue thus does not support Mr. Bradley's argument that the trial court's

credibility finding was based on a misunderstanding of the record. We conclude that the

trial court did not abuse its discretion in awarding spousal maintenance.

JUDICIAL BIAS

For the first time on appeal, Mr. Bradley contends the trial court was biased

against him. We disagree.

Mr. Bradley first argues that the judge was biased against him because "she was

the attorney representing my daughter's mother at our first custody dispute ten years ago."

Br. of Appellant at 3.

The appearance of fairness doctrine and principles of due process require a judge

to "be free of any taint of bias." *City of Lake Forest Park v. Shorelines Hr'gs Bd.*, 76

Wn. App. 212, 217, 884 P.2d 614 (1994). However, a party claiming judicial bias must

raise the issue in the trial court by moving for recusal or identifying the potential conflict.

Mr. Bradley did not do so. As such, we decline to review his claim of error for the first

time on appeal. RAP 2.5(a); *see also State v. Morgensen*, 148 Wn. App. 81, 90-91, 197

19

P.3d 715 (2008) (citing *In re Welfare of Carpenter*, 21 Wn. App. 814, 819-20, 587 P.2d 588 (1978)) (error preservation applies to claims of judicial bias).

Even if we were to briefly address his claim, it clearly fails. Mr. Bradley acknowledges it is unlikely the judge remembered this previous representation, as he did not remember the connection until after the trial. He contends, however, that there is no explanation for the court's misreading of the bank statements except judicial bias against him. The fact that Mr. Bradley did not realize a possible conflict of interest existed until after trial is not grounds to raise the issue for the first time on appeal; to the contrary, it underscores how slight the connection was. This attenuated connection is not enough to establish any taint of bias.

Mr. Bradley's second ground for judicial bias is simply the court's "erroneous belie[f] that I had stolen $368,434.38." Br. of Appellant at 3. While this error arose after trial and can be raised on appeal, it also does not support a finding of bias. "Evidence of a judge's actual or potential bias is required" to establish a violation of the appearance of fairness doctrine. *In re Marriage of Meredith*, 148 Wn. App. 887, 903, 201 P.3d 1056 (2009). "'Casual and unspecific allegations of judicial bias provide no basis for appellate review.'" *State v. Hecht*, 2 Wn. App. 2d 359, 369, 409 P.3d 1146 (2018) (quoting *Rich v. Starczewski*, 29 Wn. App. 244, 246, 628 P.2d 831 (1981)). Mr. Bradley's assertion that

the trial court believed he had stolen money and was therefore biased against him is conclusory and unsupported. That the judge's rulings were not favorable to him is not evidence of bias. *See In re Pers. Restraint of Davis*, 152 Wn.2d 647, 692, 101 P.3d 1 (2004) ("Judicial rulings alone almost never constitute a valid showing of bias."). Moreover, we note the trial court ruled in his favor on several issues, including the value of a property owned by one of his businesses, Ms. Bradley's request for attorney fees, and not granting the other relief she requested. We conclude Mr. Bradley has failed to show that the trial court was biased against him.

ATTORNEY FEES

Ms. Bradley requests attorney fees on appeal. We decline her request.

Under RCW 26.09.140, appellate courts may order a party to pay the other party's attorney fees in the appeal of a dissolution action, considering the arguable merit of the issues on appeal and the parties' financial resources. *In re Marriage of Aiken*, 194 Wn. App. 159, 174, 374 P.3d 265 (2016). Under RAP 18.1(b), however, a party must devote a section of its opening brief to a request for attorney fees. This requirement is mandatory. *Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 710 n.4, 952 P.2d 590 (1998).

No. 38279-6-III
*In re Marriage of Bradley*


Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:


_____          _____
Siddoway, C.J.                                            Staab, J.

22