IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parenting Plan of | No. 84216-1-I |
| NICHOLAS J. DARNELL, | DIVISION ONE |
| Appellant, | |
| and | UNPUBLISHED OPINION |
| HOLLY STOCKTON, | |
| Respondent. | |

SMITH, C.J. — Nicholas Darnell and Holly Stockton are parents to seven-year-old L.G.D. The parties' parenting plan provided that Darnell would be the parent with whom L.G.D. resided with the majority of the time until she reached school age, at which point Stockton would become that parent. Despite the parenting plan, L.G.D. continued to live primarily with Darnell even after she reached school age. In August 2020, soon after L.G.D. started kindergarten, Darnell moved to modify the parenting plan so that L.G.D. would continue to reside with him the majority of the time. Darnell claimed that Stockton was unable to provide a safe environment for L.G.D. and that Stockton was incapable of caring for L.G.D. In September 2020, the court entered a temporary parenting plan that kept L.G.D. residing with Darnell for the majority of the time.

In the court's final order on the petition to modify, the court found that Stockton had overly involved L.G.D. in the litigation, that she had not stayed current with L.G.D.'s education or health care or consistently exercised her

residential time, and that she continues to fixate on Darnell. The court also found that there had been a substantial change in circumstances, that the original parenting plan was harmful to L.G.D., that the harm in modifying the original plan was outweighed by the advantages of a new plan, and that a new plan would be in L.G.D.'s best interest. Despite these findings, the court reinstituted much of the original residential plan, keeping Stockton as the parent with whom L.G.D. would reside with the majority of the time. The court also made changes to the parties' summer and holiday schedules, decision-making authority, and conflict resolution procedures.

On appeal, Darnell contends that the court abused its discretion because the new parenting plan is contrary to L.G.D.'s best interests and to RCW 26.09.260. We agree that the new parenting plan is not supported by the court's findings and is inconsistent with RCW 26.09.260 and reverse.

FACTS

Nicholas Darnell and Holly Stockton began dating in early 2012 and separated in early 2015. L.G.D. was born in September 2014.

The parties had a tumultuous relationship involving substance abuse, mental health issues, and mutual allegations of domestic violence and harassment. Between 2015 and 2016, both parties sought anti-harassment orders and domestic violence protection orders against the other. In February and April 2016, Stockton was charged with two violations of the anti-harassment order. The court ordered two separate competency evaluations in relation to the harassment order violation charges.

2

In August 2016, the parties entered into an agreed parenting plan. The parenting plan provided that the parties would have joint decision-making over L.G.D.'s school and health care and that any disputes would be resolved by an agreed upon counselor. The residential schedule provided that Darnell would be the parent with whom L.G.D. resided with the majority of the time until she reached school age, at which point Stockton would become that parent. While L.G.D. was residing with Darnell the majority of the time, she would reside with Stockton every other week from Thursday evening to Sunday evening, and every Saturday from 8:00 a.m. to 8:00 p.m. After L.G.D. started kindergarten, she would reside with Stockton for the majority of the time, living with Stockton during the week and with Darnell every weekend from Friday after school until Monday morning. Darnell agreed to take full responsibility for the cost of dispute resolution and for all transportation until Stockton obtained a driver's license and car.

In early 2017, law enforcement contacted Child Protective Services (CPS) to report that Stockton had spent the night in a hotel room with L.G.D. and a registered sex offender. Stockton claimed the individual had given her a false name and that she did not know about the sex offense. Stockton ended the relationship and the CPS report was later dismissed.

In May 2017, Stockton requested a welfare check on L.G.D., asserting that L.G.D. had bruising on her stomach, arms, and legs. Police examined L.G.D. that same day and found no bruising on her body. In late 2017, Darnell called the police to report harassing e-mails from Stockton. No action was taken.

3

In August 2019, CPS screened in[1] a complaint about Darnell and his new wife, Liisa Seitz's, alleged drug use and discipline of their children. The family was referred to a Family Assessment Response due to the volume of complaints rather than the severity of a single complaint. A few months later, Darnell again reported that Stockton continued to text him repeatedly despite his requests that she stop.[2] Officers did not believe the incident constituted harassment.

In August 2020, Darnell petitioned to modify the parties' parenting plan. Darnell asserted that Stockton was unable to provide a safe environment for L.G.D., "either psychologically, emotionally, or physically" and requested that he remain the parent with whom L.G.D. resided the majority of the time. Darnell alleged that Stockton "talks relentlessly to [L.G.D.] about [him] in very negative terms," puts a "huge emotional burden" on L.G.D., and tries to "alienate" him from L.G.D. He also claimed that Stockton had "never had a stable home" and instead "lived at Mary's [P]lace or shelters throughout the Seattle area." Finally, Darnell noted that Stockton "still does not have a driver's license and she cannot transport [L.G.D.]"

In September 2020, the court found adequate cause for a modification and issued a temporary parenting plan, in which L.G.D. continued to reside with Darnell the majority of the time. The temporary plan granted Darnell sole

---

[1] When a report is "screened in," CPS conducts an investigation based on the allegations.

[2] In his briefing on appeal, Darnell contends that police cited Stockton for two counts of domestic violence telephone harassment in response to his complaint. But the testimony Darnell cites in support of this assertion relates to an incident in 2016, not this particular 2019 incident.

decision-making authority for L.G.D.'s school, health care, childcare, and extracurricular activities. The temporary parenting plan also directed Stockton to undergo a forensic psychological evaluation and to comply with all treatment recommendations.

In the meantime, a Court Appointed Special Advocate (CASA), Beth Edwards, conducted an evaluation and opined that L.G.D. "would benefit from more time with Mr. Darnell" and that "Ms. Stockton should have [L.G.D.] for two days a week." Edwards also noted that Stockton, who resides in Bellevue, "does not have a driver's license" and that L.G.D. was attending school in Renton, where Darnell lived. Edwards recommended that it was in L.G.D.'s best interest "to live primarily with the father (and not change the child's current primary residential parent)."

The parties proceeded to trial in April 2022. The court heard testimony from both parents, the CASA, several friends and family members, an Issaquah police officer, and Stockton's work supervisor.

In its final order, the court found that there had been a substantial change in circumstances, that the 2016 parenting plan was harmful to L.G.D., that the harm in changing the 2016 parenting plan was outweighed by the potential benefits of a new plan, and that a new parenting plan was in L.G.D.'s best interest. The court also made numerous findings about Stockton's parental and personal troubles, including that her fixation on Darnell resulted in a toxic coparenting dynamic; that this toxicity caused emotional harm to L.G.D.; that Stockton's mental health was concerning; that she was "notably, and seriously

5

combative during her testimony;" and that her mental health "can get in the way of her ability to parent."  The court did not make similar findings about Darnell. Instead, it noted that the 2016 parenting plan did not afford L.G.D. "a reasonable amount of time with Mr. Darnell who is also a fit parent to whom she is bonded and has spent most of her childhood living with."  It also found that "[d]isrupting contact between [L.G.D.] and her father will cause harm to [L.G.D.]".

Despite these findings, the court's new parenting plan mirrored much of the 2016 parenting plan and kept Stockton as the parent with whom L.G.D. would reside with for a majority of the time.  The court also ordered that Darnell would have sole decision-making authority over L.G.D.'s health care and schooling due to its concerns about Stockton.  Finally, the court noted that if the parties' employment schedules or geographic proximity changed to permit a more equal residential schedule, then the residential provisions would automatically change to permit a 50-50 schedule.  Darnell appealed.

ANALYSIS

Modification of Parenting Plan

Darnell contends that the court erred as a matter of law by applying RCW 26.09.187, which governs the establishment of a permanent parenting plan, rather than RCW 26.09.260, which applies to modifications of a parenting plan.  He argues that the court abused its discretion in issuing the modified parenting plan because it is contrary to L.G.D.'s best interests.  He also challenges the court's related conclusion of law that Stockton should be the

6

parent L.G.D. resides with the majority of the time as not being supported by its findings of fact. We agree.

We review a trial court's decision on modification of a parenting plan for an abuse of discretion. In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997). "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard." Littlefield, 133 Wn.2d at 47.

We review findings of fact for substantial evidence, which is a quantum of evidence sufficient to persuade a rational fair-minded person that the premise is true. Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). We do not reweigh evidence or judge witness credibility. In re Marriage of McNaught, 189 Wn. App. 545, 561, 359 P.3d 811 (2015). We review conclusions of law de novo. Dickie, 149 Wn.2d at 880.

A trial court's authority to modify a parenting plan is strictly controlled by statute. In re Marriage of McDevitt, 181 Wn. App. 765, 769, 326 P.3d 865 (2014). RCW 26.09.260 establishes a strong presumption in favor of custodial continuity and against modification as custodial changes are viewed as highly disruptive to children. In re Marriage of MacLaren, 8 Wn. App. 2d 751, 770, 440

7

P.3d 1055 (2019); In re Marriage of McDole, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993). Modification of a parenting plan is a two-step process. RCW 26.09.260-.270. First, the party seeking modification must produce an affidavit showing adequate cause for the modification before the court will permit a full hearing. RCW 26.09.270; In re Marriage of Zigler, 154 Wn. App. 803, 809, 226 P.3d 202 (2010). Once the moving party establishes adequate cause and the court holds a hearing, the court may then modify the parenting plan if it finds (1) that a substantial change has occurred in the circumstances of the child or nonmoving party as they were previously known to the court; and (2) that modification is in the child's best interests. RCW 26.09.260(1). The court must retain the residential schedule established by the original parenting plan unless it finds that the child's present environment is detrimental to the child's health and the modification will be more helpful than harmful to the child. RCW 26.09.260(2)(c). The court may also "reduce or restrict contact between the child and the parent with whom the child does not reside a majority of the time if it finds that the reduction or restriction would serve and protect the best interests of the child using the criteria in RCW 26.09.191." RCW 26.09.260(4). The "present environment" refers to the custodial environment named in the original parenting plan. George v. Helliar, 62 Wn. App. 378, 383, 814 P.2d 238 (1991).[3]

---

[3] We briefly acknowledge, and decline to follow, the definition of "present environment" set out by Division Two of this court in In re Marriage of Ambrose, 67 Wn. App. 103, 834 P.2d 101 (1992). In Ambrose, the court defined "present environment" as "the environment that is being provided to a child by the residential child's parent or custodian, contemporaneously with the trial court's consideration of the matter." 67 Wn. App. at 107. Because parties in a

1. Misapplication of RCW 26.09.187

In its findings and conclusions on the final parenting plan, the court stated:

In conclusion, several goals emerge for setting a residential schedule in this case, to: (1) hold the parties to their agreements ("b"); (2) make certain [L.G.D.] has close to equal time with each parent ("a", "c", "d", "e", and "f"); and (3) accommodate each parent's employment schedule and geographic location ("g" and "h").

These are the factors found in RCW 26.09.187, which are the criteria for establishing a permanent parenting plan. In contrast, in modification proceedings, the court does not "start from scratch" and reconsider the factors in RCW 26.09.187. Instead, the court must follow the procedures and factors set out in RCW 26.09.260. Therefore, it was an error of law for the court to consider the RCW 26.09.187 factors in this case where the parties already had a permanent parenting plan and were merely seeking to modify that plan.

We note, too, that the court erred by prioritizing permanency and by conflating continuity with permanency. At trial, the court noted that "permanency is what's in the children's best interest." And in its findings and conclusions, the court opined that "finality in parenting plans is vital" and that "[j]ust like in dependency matters, the public policy underlying family law matters centers on

---

modification proceeding are attempting to modify their permanent parenting plan, a more logical definition of "present environment" is the residential schedule called for in the permanent parenting plan. See, e.g., George v. Helliar, 62 Wn. App. 378, 383, 814 P.2d 238 (1991) ("By necessity, 'present environment' in that context refers to the custodial environment named in the original custody decree. To conclude otherwise would improperly shift the burden of proof in modification proceedings to the nonmoving party." (internal citation omitted)). We caution that a different definition of "present environment" could lead to confusion in modification proceedings, particularly if the parties are following a temporary parenting plan (or not abiding by any parenting plan at all).

9

permanency." These statements are contrary to the policy goals set forth in chapter 26.09 RCW, which prioritizes children's wellbeing and continuity. The policy section of the chapter provides the best interests of the child are "served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care." RCW 26.09.002. It also emphasizes the importance of maintaining "the existing pattern of interaction between a parent and child" and notes that it should be altered only "to the extent necessitated by the changed relationship of the parents or as required to protect the child from physical, mental, or emotional harm." RCW 26.09.002. These goals are distinctly different from those of dependency proceedings, which aim to preserve the family unit and to protect a child's right to "a safe, stable, and permanent home." RCW 13.34.020.

2. Modified Parenting Plan and Challenged Conclusions of Law

Darnell asserts that the court's conclusion that Stockton should be the parent L.G.D. resides with the majority of the time is not supported by the court's findings of fact.[4] We agree.

As discussed, the court found that there had been a substantial change in circumstances, that the custodial environment had deteriorated, that the 2016 parenting plan was harmful to L.G.D., that the advantages of a new parenting

---

[4] Darnell also challenges the court's conclusion that if the parties' employment schedules of geographic proximity ever change to permit more equal time during the school schedule, then the residential schedule will automatically change to a 50-50 schedule. Because Darnell does not devote any section of his brief to discussing this challenged conclusion, we decline to address it. See State v. Elliott, 114 Wn.2d 6, 15, 785 P.2d 440 (1990) ("This court will not consider claims insufficiently argued by the parties.").

plan outweighed the harms, and that a new parenting plan was in L.G.D.'s best interests.

The court also found that the "co-parenting dynamic is toxic" and "causing emotional harm [to L.G.D.]" and that "[t]he toxicity has the potential to cause even greater harm to [L.G.D.] as her trials and tribulations grow more consequential with age." The court then found that it was "more likely than not [that] (a) Ms. Stockton has overly involved [L.G.D.] in this litigation, (b) Ms. Stockton had not stayed current with [L.G.D.]'s education and health care or consistently exercised her parenting time with [L.G.D.], and (c) Ms. Stockton continues to blame Mr. Darnell for every problem."

In its findings on L.G.D.'s present environment, the court noted that the custodial environment had deteriorated, that joint decision-making was "impossible," and that the parties' original parenting plan "does not afford [L.G.D.] a reasonable amount with Mr. Darnell who is also a fit parent to whom she is bonded and has spent most of her childhood living with."

The court also made findings as to each parent. As to Darnell, it found that he is a self-admitted daily marijuana user but that a finding for substance abuse was not warranted. As to Stockton, it found that her mental health was "concerning" and noted that the forensic psychological evaluation contained questions about her "tendency towards outbursts of verbal aggression, rigidness, compulsiveness, and potential ADHD features, which were fully present at trial." It also found that Stockton was "notably, and seriously combative during her testimony" and that "[i]n considering all the evidence, Mr. Darnell ha[d] met his

11

burden to show [Stockton's] mental heath can get in the way of her ability to parent." On that note, the court found that Stockton's tendency for "[s]tress overload and low coping skills create a real danger or risk of harm to [L.G.D.]" and that "[a] finding for an emotional or physical problem is warranted."

Despite the litany of findings indicating that L.G.D. should reside with Darnell the majority of the time and the court's own acknowledgement that the original residential schedule "contradicts a substantial and impressive consensus within our case law and statutes about the importance of continuity and stability in the child's environment," the court largely reinstituted the same residential schedule, altering only the parties' summer and holiday schedules. The court's conclusion that L.G.D. should live the majority of the time with Stockton is not supported by its numerous findings that Stockton struggles to adequately care for L.G.D. We also highlight the impracticality of the newly modified residential schedule: Stockton lives in Bellevue, has neither a driver's license nor a car, nor the means to use a ride-share service, and testified that she has no intention of getting a license and that she cannot transport L.G.D. to school. Instead, Darnell, who lives in Renton and works during the day, is tasked with arranging for L.G.D.'s transportation to and from school each day.[5] The new parenting plan also does not provide a deadline for Stockton to obtain a driver's license or car; thus, Darnell could remain responsible for arranging L.G.D.'s transportation for

---

[5] It is unclear whether Stockton has enrolled L.G.D. in a school in Bellevue as permitted by the new parenting plan or whether L.G.D. is still enrolled in Renton. Either way, it is unreasonable for Darnell to be solely responsible for transporting L.G.D.

the foreseeable future, as he has been for the last several years. Furthermore, Stockton is now responsible for caring for L.G.D. for five days a week but has no decision-making authority over her education or health care.

The court's findings of fact do not support the its conclusion that Stockton should be the parent with whom L.G.D. resides the majority of the time. And because the modified parenting plan is manifestly unreasonable, we conclude that the court abused its discretion in entering the new parenting plan.

<u>RCW 26.09.191 Restrictions</u>

Darnell also asserts that the court erred by failing to conclude that Stockton uses conflict to the detriment of L.G.D. despite entering several related findings. We disagree that the court made such findings and remand for the court to enter findings about Stockton's abusive use of conflict, any related conclusions of law, and any further restrictions the court sees necessary.

RCW 26.09.191(3) provides that the court may limit any provision of a parenting plan if a parent's involvement or conduct may have an adverse effect on the child's best interest. The statute lists several factors that may serve as the basis for such a limitation, including the abusive use of conflict, long-term emotional or physical impairment, or any other factors as the court expressly finds adverse to the best interests of the child. RCW 26.09.191(3).

Here, the court found that "[t]he greatest concern is the history of criminal charges and protection order proceedings between the parties" and concluded that "it warrants a finding against both parents under RCW 26.09.19(g) ('Such other factors or conduct as the court expressly finds adverse to the best interests

of the child.')."[6]  The also court restricted Stockton's decision-making authority, gave Darnell sole decision-making authority over health care, and limited the parties' communication methods accordingly.  The court stated that Darnell "will mostly have sole decision-making over education," except that Stockton could enroll L.G.D. in a "local school" of her choosing after L.G.D. completes first grade.

Contrary to Darnell's assertion, the court did not make findings about Stockton's abusive use of conflict; it merely summarized testimony from trial that could support such a finding.  But because Darnell requested a restriction based on such a finding, the court should have made a finding as to whether Stockton engaged in abusive use of conflict.  We also note that Darnell requested sole decision-making authority for childcare and L.G.D.'s extracurricular activities but that the court failed to address this request.

On remand, the court is directed to enter findings of fact and any related conclusions of law concerning the allegation of abusive use of conflict, and if it finds that it exists, determine whether further restrictions are necessary.  It should also rule on Darnell's request for sole decision-making over childcare and extracurricular activities.

We reverse and remand for entry of a new parenting plan consistent with this opinion.  We also direct the court to revisit any child support order that was

---

[6] Darnell also assigns error to this finding as being unsupported by substantial evidence but does not devote any space in his briefing to explaining this challenge.  See Elliott, 114 Wn.2d at 15 ("This court will not consider claims insufficiently argued by the parties.").

14

entered in light of the fact that L.G.D. will reside with Darnell the majority of the time.

_Smith, C.J._

WE CONCUR:

_Feldman, J._          _Dwyer, J._